**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

        *Plaintiff*,

   v.

U.S. DEPARTMENT OF JUSTICE,

        *Defendant*.

---

Civil Action No. 24 - 1497 (LLA)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") filed this suit

pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking records related to

the now-closed criminal investigation of former Congressman Matt Gaetz (Count I).  ECF No. 1.

CREW also claims that the Department of Justice ("DOJ") violated FOIA by employing a policy

or practice of refusing to confirm or deny the existence of records related to investigations of public

officials (known as a *Glomar* response) (Count II).  *Id.*[1]  Before the court are CREW's motion for

summary judgment on Count I, ECF No. 22, and the parties' cross-motions for summary judgment

on Count II, ECF Nos. 18, 23.  For the reasons explained below, the court denies CREW's motion

for summary judgment on Count I as moot and denies both parties' motions for summary judgment

on Count II.

---

[1] CREW also brought a claim that DOJ violated FOIA by categorically withholding records without conducting a case-by-case analysis (Count III), ECF No. 1 ¶¶ 46-51, which the court dismissed, ECF No. 12, at 21-24.

## I.    FACTUAL BACKGROUND

### A.    Gaetz Request (Count I)

In February 2023, CREW submitted a FOIA request to the Federal Bureau of Investigation

("FBI") and DOJ seeking

> all records related to the now-closed investigation conducted by
> DOJ and the Federal Bureau of Investigation ("FBI") of Rep. Matt
> Gaetz (R-FL) that are not covered by grand jury secrecy pursuant to
> Rule 6(e) of the Federal Rules of Criminal Procedure, including but
> not limited to DOJ's decision not to bring criminal charges against
> Rep. Gaetz.

ECF No. 22-3, at 6.[2]    CREW sought the records because they would "help explain why

Rep. Gaetz—a prominent member of Congress—was not charged with any crime despite public

reporting suggesting an abundance of evidence that he likely violated sex-trafficking laws and the

conviction of his close associate on similar charges." *Id.* at 8.    It further argued that "[t]he public

has a vital interest in learning whether the decision not to prosecute Rep. Gaetz was motivated,

even in part, by considerations apart from the sufficiency of the evidence against him." *Id.*

In November 2023, the FBI "categorically denied" CREW's request pursuant to FOIA

Exemptions 6 and 7(C).   *Id.* at 14; *see* 5 U.S.C. § 552(b).[3]   While the FBI acknowledged that it

had completed a search for responsive records, it declined to reveal them because doing so "would

constitute an unwarranted invasion of personal privacy."    ECF No. 22-3, at 14.    CREW

---

[2] When citing ECF Nos. 18-3 to 18-6, 22-3, 23-2, 23-3, 29-1 to 29-3, and 32, the court refers to the CM/ECF-generated numbers at the top of each page rather than any internal pagination.

[3] Exemption 6 carves out "personnel . . . [,] medical . . . [,] and similar files[,] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Meanwhile, Exemption 7(C) excuses disclosure of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C).

administratively appealed the FBI's decision, *id.* at 19-23, and that appeal was closed in September 2024 after CREW filed this suit, *id.* at 25 ("[A]n appeal ordinarily will not be acted upon by [DOJ] if the FOIA request becomes the subject of litigation."); *see* 28 C.F.R. § 16.8(b)(2). In October 2024, the FBI notified CREW that it was reviewing responsive records "on an interim basis for segregability."  ECF No. 22-3, at 27.

**B.      CREW'S FOIA Requests Concerning Investigations of Public Officials (Count II)**

In recent years, CREW has filed more than a dozen FOIA requests to various DOJ divisions, also known as components, seeking records related to investigations of public officials. In response to some of these requests, DOJ components have issued "*Glomar*" responses, neither confirming nor denying the existence of responsive records.  These responses have led CREW to believe that DOJ has a policy or practice of "issuing *Glomar* responses to CREW simply because a FOIA request seeks records relating to an investigation of a third party, even when that investigation has been publicly disclosed," in violation of FOIA.  ECF No. 1 ¶ 43.  Responses to these requests by five DOJ components—the FBI, Criminal Division, Executive Office of United States Attorneys ("EOUSA"), Office of Information Policy ("OIP"), and Office of Professional Responsibility ("OPR")—form the basis for CREW's policy-or-practice claim.

### 1.      Morehead request

In April 2024, CREW submitted a request to the EOUSA and OPR seeking records relating to former Assistant U.S. Attorney ("AUSA") Terra Morehead's "proven or alleged violations" of the law, Constitution, DOJ's U.S. Attorneys' Manual, Kansas's disciplinary rules, or "any other professional misconduct."  ECF No. 23-3, at 156-57.  The request also sought "[a]ll records relating to any DOJ investigations, actions . . . , or decisions not to take action, in regard to

3

AUSA Morehead's conduct as an AUSA or prosecutor for the State of Kansas." *Id.* at 157. In the request, CREW cited examples of federal courts criticizing AUSA Morehead "for her serious misconduct as a federal prosecutor related to undue influence of witnesses, failure to disclose material information, and unauthorized access to attorney-client communications." *Id.* at 158; *see* ECF No. 23-2, at 8 ¶ 33.

The next day, the EOUSA issued a response stating that "[t]o the extent that non-public responsive records exist, without consent, proof of death, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy" and citing FOIA Exemptions 6 and 7(C). ECF No. 23-3, at 163. The EOUSA also wrote that "[b]ecause any non-public records responsive to [the] request would be categorically exempt from disclosure, this Office is not required to conduct a search for the requested records." *Id.* In November 2024, OPR issued its response, stating that it "refuse[d] to confirm or deny the existence of any records that are subject to the protection of Exemption 6" and "[t]o the extent that [the] request seeks law enforcement records, OPR refuse[d] to confirm or deny the existence of records responsive to [the] request pursuant to" Exemption 7(C). *Id.* at 168.

### 2.    Kelsey request

In April 2023, CREW submitted a request to the Criminal Division and two U.S. Attorney's Offices seeking "all documents related to DOJ's investigation of Tennessee State Senator Brian Kelsey for violating campaign finance laws and conspiring to defraud the Federal Election Commission ('FEC') as part of a scheme to benefit his 2016 campaign for U.S. Congress" that mention seven names, including, as relevant here, "Amanda Bunning Kelsey (formerly Amanda Bunning)" and "Josh Smith." *Id.* at 147. In its request, CREW stated that DOJ had

"issued a press release announcing that Senator Kelsey had pleaded guilty to violating campaign finance laws and conspiring to defraud the FEC." *Id.* at 148; *see* ECF No. 23-2, at 3 ¶ 8. The request also cited a local news article reporting on Senator Kelsey's guilty plea and his co-conspirators. ECF No. 23-3, at 149.

In response, the Criminal Division addressed the part of CREW's request regarding Mr. Smith separately from the other six names. *Id.* at 153. With respect to Mr. Smith, the Criminal Division responded that "to the extent that non-public responsive records exist, without consent, proof of death, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of privacy" and cited Exemption 7(C). *Id.* And with respect to the rest of CREW's request, including records mentioning Ms. Bunning, the Criminal Division "decided to neither confirm nor deny the existence of [responsive] records pursuant to Exemptions 6 and 7(C)." *Id.* CREW then administratively appealed, and OIP affirmed the Criminal Division's determinations. ECF No. 18-3, at 21-22.

### 3.    Fortenberry request

In March 2025, CREW submitted a request to the EOUSA and Criminal Division seeking "[a]ll records relating to the investigation of former United States Representative Jeffrey Fortenberry [for] proven or alleged violations . . . of any provisions of law or constitution, including but not limited to those relating to his indictment by a federal grand jury" in October 2021, as well as "[a]ll records relating to any DOJ investigations, actions, or decisions not to take action, . . . including but not limited to records related to DOJ's motion to dismiss" Representative Fortenberry's indictment with prejudice. ECF No. 23-3, at 191-92. The request cited a DOJ press release announcing that Representative Fortenberry had been indicted by a grand jury. *Id.* at 192.

In response, the EOUSA stated that "[t]o the extent that non-public responsive records exist, without consent, proof of death, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy" and cited Exemptions 6 and 7(C).  *Id.* at 196.  The Criminal Division responded that CREW's request appeared to seek investigation records maintained by a U.S. Attorney's Office, so the EOUSA was the proper recipient of the request. *Id.* at 201.  The Criminal Division further stated that "[t]o the extent [CREW was] seeking other investigation records on . . . Representative Jeffrey Fortenberry, . . . [it] decided to neither confirm nor deny the existence of such records" pursuant to Exemptions 6 and 7(C).  *Id.*

### 4.     Evans request

In March 2023, CREW submitted a request to the EOUSA seeking the "full case file of the United States Attorney's Office for the District of Columbia for *United States v. Derrick Evans*, 21-cr-337 (D.D.C), including but not limited to any video evidence or other evidence documenting Evans' actions on or around January 6, 2021."  *Id.* at 204.  The request explained that then-West Virginia House Delegate Evans had "pled guilty to a felony charge in which, as part of his plea agreement, he admitted to joining the mob, breaching the Capitol, obstructing law enforcement during a civil disorder, and disrupting the certification of the 2020 presidential election."  *Id.* at 205.

In response, the EOUSA stated that "[r]ecords pertaining to a third party generally cannot be released absent express authorization and consent of the third party, proof that the subject of [the] request is deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest and that significant public benefit would result from the disclosure of the requested records."  *Id.* at 209.  Because CREW had not made any such showing, the EOUSA

explained that "the release of records concerning a third party would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C.§ 552a" and that such records were "generally exempt from disclosure" pursuant to Exemptions 6 and 7(C). *Id.*

### 5.    Mastriano request

In September 2022, CREW submitted a request to the FBI seeking "[a]ll interview notes, summaries, memoranda, video recordings, audio recordings, or other records concerning Pennsylvania State Senator Douglas Mastriano," "[a]ll records provided by Senator Mastriano to the FBI," and "[a]ll complaints, tips, referrals, allegations, or other submissions received by the FBI relating to Senator Mastriano." ECF No. 18-4, at 20; *see* ECF No. 23-2 at 4 ¶ 15. The request stated that, according to a news article, "Senator Mastriano's attorney ha[d] publicly acknowledged Mastriano 'sat for a voluntary interview with the FBI' regarding [his involvement in the 'Stop the Steal' movement] and claim[ed] 'the FBI cleared him.'" ECF No. 18-4, at 21 (citation omitted); *see* ECF No. 23-2, at 4 ¶ 16.

Later that month, the FBI advised that it would "neither confirm nor deny the existence of such records" pursuant to Exemptions 6 and 7(C).    ECF No. 18-4, at 27 ("The mere acknowledgement of the existence of FBI records on third[-]party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy.").    CREW then administratively appealed, arguing that the FBI could not issue a *Glomar* response where, as here, the "subject of a law enforcement investigation ha[d] publicly disclosed the existence of the investigation." *Id.* at 34.  CREW also argued that there was a significant public interest in "shining a light on the FBI's investigation of the unprecedented January 6, 2021 attack on the U.S. Capitol [and] the FBI's alleged decision to clear Mr. Mastriano of any wrongdoing," which rendered

improper the FBI's "categorical withholding" of records. *Id.* at 34-35 (internal quotation marks omitted).

OIP then partially remanded the request to the FBI for "further review of the first subpart of [the] request"—regarding interview records—and affirmed the FBI's response as to the rest of the request. *Id.* at 39. On remand, the FBI determined that the first part of CREW's request sought "records on a third[-]party individual that is exempt from disclosure" pursuant to Exemptions 6 and 7(C), and it closed CREW's request. *Id.* at 44.

### 6.      Egyptian President request

In September 2024, CREW submitted to the FBI, OIP, and the EOUSA a request for "all records related to the now-closed investigation conducted by DOJ and the [FBI] concerning a $10 million withdrawal from the National Bank of Egypt which aligned with classified U.S. intelligence indicating that Egyptian President Abdel Fatah El-Sisi sought to give $10 million to support former President Donald Trump's 2016 presidential campaign." ECF No. 23-3, at 213. CREW's request cited a news article reporting on DOJ's investigation. *Id.* at 214.

In its response, the FBI stated that the request sought "records on one or more third[-]party individuals" and declined to confirm or deny the existence of such records pursuant to Exemptions 6 and 7(C). *Id.* at 218. The FBI also refused to confirm or deny the existence of responsive records by invoking Exemption 1, which protects against disclosure of classified national security information, and Exemption 7(E), which protects law-enforcement records that would "disclose techniques and procedures for law enforcement investigations or prosecutions." *Id.*; *see* 5 U.S.C. § 552(b)(1), (b)(7)(E).

8

### 7.    Giuliani and Kallstrom requests

In November 2016, CREW submitted a request to the FBI for "all communications between any agents or employees of the [FBI] and Rudy Giuliani from July 4, 2016 to the present." ECF No. 23-3, at 223.    The request cited statements made by former New York City Mayor Giuliani to news outlets referring to his conversations with FBI agents about the FBI's investigation of former Secretary of State Hillary Clinton.  *Id.* at 224.  CREW submitted the same request for "communications between any agents or employees of the [FBI] and James Kallstrom from October 1, 2015 to the present."  *Id.* at 227.  CREW's request cited statements made by Mr. Kallstrom, a former FBI official, about discussions with FBI agents about the Clinton investigation.  *Id.* at 228.  In response to both requests, the FBI declined to confirm or deny the existence of responsive records in the absence of "an authorization and consent from the individual(s)," "proof of death," or "a justification that the public interest in disclosure outweighs personal privacy," citing Exemptions 6 and 7(C).  *Id.* at 231, 234.

### 8.    Kindred request

In August 2024, CREW submitted a FOIA request to the EOUSA, OPR, and the Office of the Inspector General, seeking internal communications among employees of the U.S. Attorney's Office for the District of Alaska and Office of the Federal Defender for the District of Alaska relating to misconduct by former federal judge Joshua Kindred and relating to the AUSA "from whom Judge Kindred received nude photographs (as found by the Judicial Council of the Ninth Circuit on May 23, 2024)."  *Id.* at 237-38.  The request also sought "[a]ll records of any DOJ investigations, actions . . . , or decisions not to take action, in regard to any communication between Judge Kindred" and the AUSA.  *Id.* at 238.  CREW's request cited a Judicial Council of

the Ninth Circuit order and certification finding that Judge Kindred had engaged in misconduct. *Id.* at 239-40.

The EOUSA responded that CREW was requesting records concerning a "third party" and that "[t]o the extent that non-public responsive records exist, without consent, proof of death, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to constitute an unwarranted invasion of personal privacy," and it cited Exemptions 6 and 7(C). *Id.* at 243. Accordingly, the EOUSA stated that it was "not required to conduct a search" because "any non-public records responsive to [the] request would be categorically exempt from disclosure." *Id.* The EOUSA also noted that the request sought "records concerning Joshua Kindred" and declined to confirm or deny the existence of such records pursuant to Exemptions 6 and 7(C). *Id.*

### 9.    Zinke request

In March 2022, CREW submitted a request to the Criminal Division seeking "[a]ll records relating to U.S. Department of Interior Office of Inspector General ('Interior OIG') referral to DOJ concerning its finding that former Secretary of the Interior Ryan Zinke" violated various ethical standards and "[a]ll records relating to DOJ's summer 2021 decision to decline prosecution of Ryan Zinke following Interior OIG's referral." ECF No. 18-3, at 24. In its request, CREW indicated that, the previous month, the "Interior OIG [had] stated in a public report that DOJ declined to prosecute the former Secretary of the Interior following a referral by the Interior OIG." *Id.* at 25; *see* ECF No. 23-2, at 2 ¶ 3.

The following month, the Criminal Division responded that "[t]o the extent that non-public responsive records exist, without consent, proof of death, or an overriding public interest, disclosure of law enforcement records concerning an individual could reasonably be expected to

constitute an unwarranted invasion of privacy" and cited Exemption 7(C).  ECF No. 18-3, at 29.  CREW administratively appealed the Criminal Division's determination, and OIP remanded the request to the Criminal Division for further processing.  *Id.* at 32.  The Criminal Division acknowledged receipt of the request and initiated a search, but it notified CREW that its request presented "unusual circumstances" warranting an extension of time for the agency to respond.  *Id.* at 35; *see id.* at 4-5 ¶ 9 (providing no further update on the Criminal Division's response).

### 10.    Trump companies request

In February 2017, CREW submitted a request to the Criminal Division seeking "all records related to investigations conducted by DOJ and the [FBI] of companies owned or associated with Donald J. Trump, including, but not limited to, investigations under the Foreign Corrupt Practices Act" that used various search terms.  ECF No. 23-3, at 139-40.  In response, the Criminal Division declined to confirm or deny the existence of responsive records, explaining that, "with respect to the named individual, lacking their consent, proof of death, an official acknowledgment of an investigation of them, or an overriding public interest, even to acknowledge the existence of such records pertaining to this individual would constitute a clearly unwarranted invasion of personal privacy and could reasonably be expected to constitute an unwarranted invasion of their personal privacy" under Exemptions 6 and 7(C).  *Id.* at 144.

### II.    PROCEDURAL HISTORY

CREW filed this action against DOJ in May 2024, raising three counts under FOIA.  ECF No. 1.  First, CREW alleged that DOJ had wrongfully withheld responsive records relating to the investigation of former Representative Gaetz (Count I).  *Id.* ¶¶ 36-41.  Next, it argued that DOJ and its components had improperly adopted a blanket policy of issuing *Glomar* responses to any

request for records relating to publicly disclosed investigations of public officials (Count II). *Id.* ¶¶ 42-45. Finally, it alleged that DOJ and its components had also improperly adopted a policy of categorically denying such requests "without conducting any case-by-case balancing of the public and private interests at stake" (Count III). *Id.* ¶¶ 46-51. CREW sought declaratory and injunctive relief. *Id.* at 11-12.

In July 2024, DOJ moved to dismiss Counts II and III under Federal Rule of Civil Procedure 12(b)(6). ECF No. 8. The court denied the motion as to Count II, finding that CREW had plausibly alleged that DOJ "adopted, endorsed, or implemented" a policy or practice that violates FOIA. ECF No. 12, at 17-18 (quoting *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 293 (D.D.C. 2013) ("*Muttitt II*")). Specifically, CREW had shown that various DOJ components provided *Glomar* responses to six of its FOIA requests seeking records relating to a publicly disclosed investigation of a public official. *See id.* at 9-20. The court granted DOJ's motion to dismiss Count III, however, determining that CREW had not sufficiently alleged a policy-or-practice claim based on the FBI's categorical denials. *Id.* at 21-24.

DOJ then filed an answer, ECF No. 15, and a motion for summary judgment on Count II, ECF No. 18. CREW filed a motion for summary judgment on Count I, ECF No. 22, and a cross-motion for summary judgment on Count II, ECF No. 23. In March 2026, DOJ filed a status report indicating that the FBI had made its first production of records in response to CREW's request relating to the investigation of Representative Gaetz and that approximately 8,500 potentially responsive pages remain to be processed. ECF No. 32, at 4. The parties' motions for summary judgment are fully briefed. ECF Nos. 18, 22 to 24, 29 to 31.

### III.    LEGAL STANDARDS

The purpose of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Am. C.L. Union v. U.S. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011) ("*ACLU I*") (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Congress nonetheless included nine exemptions from disclosure that "are intended to balance the public's interest in governmental transparency against the legitimate governmental and private interests [that] could be harmed by release of certain types of information."  *Tipograph v. Dep't of Just.*, 83 F. Supp. 3d 234, 238 (D.D.C. 2015) (alteration in original) (internal quotation marks omitted) (quoting *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010)); *see* 5 U.S.C. § 552(a)(3)(A), (a)(8)(A)(i), (b)(1)-(9).

Unless the requested records fall under one of FOIA's nine exemptions, an agency must generally search for and disclose any documents responsive to a request.  In some cases, however, "merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'"  *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health, Dep't of Health & Hum. Servs.*, 745 F.3d 535, 540 (D.C. Cir. 2014) ("*PETA*") (alteration in original) (quoting *Wolf v. Cent. Intel. Agency*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  In such cases, an agency may issue a *Glomar* response, "refus[ing] to confirm or deny the existence or nonexistence of responsive records."  *Elec. Priv. Info. Ctr. v. Nat'l Sec. Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012) ("*EPIC I*").[4]  A *Glomar* response is therefore "an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and

---

[4] The *Glomar* response takes its name from the ship involved in *Phillippi v. Central Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).  In that case, the Central Intelligence Agency refused to confirm or deny the existence of records about a ship called the "Hughes Glomar Explorer," which was used in a classified Cold-War-era project.

provide specific, non-conclusory justifications for withholding that information." *Am. C.L. Union v. Cent. Intel. Agency*, 710 F.3d 422, 426 (D.C. Cir. 2013) ("*ACLU II*") (quoting *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)).  An agency may issue a *Glomar* response only "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *PETA*, 745 F.3d at 540 (quoting *Wolf*, 473 F.3d at 374).

As an alternative to a *Glomar* response, an agency may respond to a FOIA request with a "categorical denial," which is a categorical withholding of the *contents* of records pursuant to a FOIA exception.  *Jurdi v. United States*, 485 F. Supp. 3d 83, 92 (D.D.C. 2020); *see Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088-89 (D.C. Cir. 2014) ("*CREW I*") (explaining that categorical treatment is appropriate "only when the range of circumstances included in the category characteristically supports an inference that the statutory requirements for exemption are satisfied" (internal quotation marks omitted)).

While FOIA requests must generally be litigated individually, there is a narrow exception permitting a plaintiff to raise a "policy or practice" claim under FOIA when the plaintiff argues "that an agency policy or practice will impair [the plaintiff's] lawful access to information in the future." *Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 249 F. Supp. 3d 275, 281 (D.D.C. 2017) (quoting *Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012)).[5] A plaintiff can establish such a claim by showing that an agency "has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing 'failure to abide by the terms of the FOIA.'" *Muttitt II*, 926 F. Supp. 2d at 293 (quoting *Payne Enters., Inc. v. United States*, 837

---

[5] Courts in this Circuit use the terms "policy or practice" and "pattern or practice" interchangeably in addressing this type of FOIA claim.  This court will use "policy or practice," which is the D.C. Circuit's chosen terminology.  *See Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 774 (D.C. Cir. 2018).

F.2d 486, 491 (D.C. Cir. 1988)).  The policy can be "informal, rather than articulated in regulations or an official statement." *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 231 (D.D.C. 2011) ("*Muttitt I*") (quoting *Payne Enters.*, 837 F.2d at 491).  "[I]solated" incidents of noncompliance do not suffice.  *Payne Enters.*, 837 F.2d at 491.

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is properly granted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to show that there is an "absence of a genuine issue of material fact" in dispute. *Id.* at 323.

When the propriety of a *Glomar* response or the applicability of an exemption is at issue, summary judgment may be awarded to the agency based solely on the agency's affidavits or declarations.  *See Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  A court "may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *EPIC I*, 678 F.3d at 931 (quoting *Gardels v. Cent. Intel. Agency*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)); *see SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (explaining that agency affidavits and declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents'"

(quoting *Ground Saucer Watch, Inc. v. Cent. Intel. Agency*, 692 F.2d 770, 771 (D.C. Cir. 1981))).

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *EPIC I*, 678 F.3d at 931 (quoting *Larson*, 565 F.3d at 862). With respect to policy-or-practice claims, the plaintiff bears the burden of demonstrating that the alleged policy or practice exists and that it "will impair the [plaintiff's] lawful access to information in the future." *Am. Ctr. for L. & Just.*, 249 F. Supp. 3d at 281 (quoting *Newport Aeronautical Sales*, 684 F.3d at 164); *see Nat'l Sec. Couns. v. Cent. Intel Agency*, 960 F. Supp. 2d 101, 133 (D.C. Cir. 2013).

## IV.    DISCUSSION

### A.    Count I

The court begins by addressing Count I, which challenges DOJ's categorical withholding of responsive records relating to its investigation of former Representative Gaetz. After CREW moved for summary judgment on Count I, DOJ withdrew its categorical denial of CREW's request for records relating to the investigation of Representative Gaetz and agreed to "process CREW's request and produce responsive, non-exempt records." ECF No. 29, at 18 (noting that DOJ had learned of Representative Gaetz's "public acknowledgement of the existence of a DOJ investigation implicating his official duties"); *see* ECF No. 32, at 4 (stating that the FBI released thirty-nine pages to CREW on March 9, 2026 and "is making monthly interim releases" for the remaining 8,500 potentially responsive pages). DOJ requests that the court deny as moot CREW's motion for summary judgment on Count I, ECF No. 29, at 18, and CREW does not oppose the request, ECF No. 31, at 23. The court accordingly denies CREW's motion for summary judgment on Count I. CREW may renew its motion in the event that DOJ fails to effectively process its request.

**B.    Count II**

In Count II, CREW contends that DOJ has a policy or practice of issuing improper *Glomar* responses to FOIA requests seeking records related to publicly disclosed investigations of public officials.    ECF No. 1 ¶ 43; *see* ECF No. 23-1, at 21 (criticizing DOJ's "knee-jerk *Glomar* responses").[6]    In CREW's view, this policy or practice has two aspects: (1) DOJ's failure to consider whether it has already disclosed the existence of responsive records, which would waive the agency's right to invoke a *Glomar* response under the "official acknowledgment" doctrine, *see* ECF No. 23-1, at 23-29; and (2) DOJ's misapplication of governing legal standards when determining whether a non-*Glomar* response would actually cause harm under FOIA Exemptions 6 and 7(C), *see id.* at 12-19, 29-34.  As support, CREW points to ten FOIA requests for which it received *Glomar* responses.[7]  *Id.* at 20-34.

DOJ disputes both aspects of this alleged policy, asserting that its components "process[] FOIA requests pertaining to third-party investigations by performing an individualized analysis"

---

[6] CREW has standing to pursue its policy-or-practice claim because of its "clear intent," *Nat'l Sec. Couns. v. Cent. Intel. Agency*, 931 F. Supp. 2d 77, 93 (D.D.C. 2013) (internal quotation marks omitted), to file further FOIA requests for records relating to publicly disclosed investigations, as evidenced by the slew of FOIA requests it has submitted in recent years, *see generally* ECF No. 23-3, and its stated "inten[t] to submit similar requests in the future," ECF No. 1 ¶ 35.  These future requests are "themselves likely to implicate the challenged policies in the future."  *Nat'l Sec. Couns.*, 931 F. Supp. 2d at 93.

[7] CREW relies on four requests cited in its complaint, *see* ECF No. 1 ¶ 31; ECF Nos. 1-9, 1-12 to 1-15 (Morehead, Kelsey, Zinke, and Mastriano requests), and additional requests raised for the first time in its summary judgment briefing, *see* ECF No. 23-1, at 21, 27-28, 31-34 (Trump companies, Fortenberry, Evans, Egyptian President, Giuliani/Kallstrom, and Kindred requests). While DOJ notes that CREW "cites additional FOIA requests for the first time in its [cross-motion and] opposition," DOJ does not object to the court's consideration of all of CREW's requests. ECF No. 29, at 6.  CREW's complaint also cited requests it had submitted to the EOUSA and OIP for records relating to DOJ investigations of Mr. Giuliani.  *See* ECF Nos. 1-10, 1-11; *see also* ECF No. 18-5, at 18; ECF No. 18-6, at 8.  Since CREW does not rely on DOJ's *Glomar* responses to these requests in its summary judgment briefing, *see* ECF No. 23-1, at 32 n.10, the court declines to address them.

in accordance with FOIA.  ECF No. 18-1, at 14.  As support, DOJ submitted seven declarations from officials who oversee FOIA requests for the relevant components: the Criminal Division, *see* ECF No. 18-3 (O'Keefe Declaration); ECF No. 29-3 (Butler Declaration); the FBI, *see* ECF No. 18-4 (Hammer Declaration); the EOUSA, *see* ECF No. 18-6 (Jolly Declaration); ECF No. 29-1 (Supplemental Jolly Declaration); OIP, *see* ECF No. 18-5 (O'Neill Declaration); and OPR, *see* ECF No. 29-2 (McCarty Declaration).

The court concludes that CREW has not carried its burden of showing that DOJ has an across-the-board policy or practice of issuing *Glomar* responses whenever a FOIA request for investigation-related records identifies a subject by name, and it will accordingly deny CREW's motion for summary judgment on Count II.  But that does not mean that DOJ is entitled to summary judgment, because CREW has identified ways in which individual DOJ components appear to be acting inconsistently with FOIA in a manner that could support component-specific policy-or-practice claims.  The court begins by addressing the propriety of DOJ's challenged *Glomar* responses before turning to whether the deficiencies identified by CREW—and further revealed in DOJ's declarations—establish a policy or practice that violates FOIA.

### 1.    Official agency acknowledgment

CREW argues that DOJ ignores evidence that the agency has officially acknowledged the existence of an investigation, pointing to four examples of FOIA requests it submitted to DOJ components.  ECF No. 23-1, at 24-28.  Under the "official acknowledgment doctrine," an agency's official acknowledgment of the existence of a requested record waives the agency's right to make a *Glomar* response.  *Knight First Amend. Inst. at Columbia Univ. v. Cent. Intel. Agency*, 11 F.4th 810, 815 (D.C. Cir. 2021); *see ACLU II*, 710 F.3d at 427 ("[T]he plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or

nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect.").[8]  "To establish official acknowledgment, a plaintiff must identify information in the public domain that (1) matches the information requested, (2) is as specific, and (3) has 'been made public through an official and documented disclosure.'"  *Knight First Amend. Inst.*, 11 F.4th at 815 (quoting *Fitzgibbon v. Cent. Intel. Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  The requester "must *pinpoint* an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency."  *Montgomery v. Internal Revenue Serv.*, 356 F. Supp. 3d 74, 82 (D.D.C. 2019) (quoting *James Madison Project v. Dep't of Just.*, 302 F. Supp. 3d 12, 21 (D.D.C. 2018)).  In the *Glomar* context, an official disclosure need only establish the existence or nonexistence of records responsive to the FOIA request, even if the contents of the records themselves have not been disclosed.  *ACLU II*, 710 F.3d at 427.  The D.C. Circuit has repeatedly emphasized that courts must apply the official-acknowledgment test strictly, because "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption."  *BuzzFeed, Inc. v. Dep't of Just.*, 344 F. Supp. 3d 396, 408 (D.D.C. 2018) (quoting *Wolf*, 473 F.3d at 378).  "Disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption."  *Mobley v. Cent. Intel. Agency*, 806 F.3d 568, 583 (D.C. Cir. 2015).  Similarly, "[t]he press and other non-official sources cannot waive the government's right to invoke a *Glomar* response."  *Buzzfeed*, 344 F. Supp. 3d at 408.

---

[8] CREW refers to this rule as the "public domain exception," *see, e.g.*, ECF No. 23-1, at 24, and the D.C. Circuit has used "public domain" and "official acknowledgment" interchangeably when referring to this doctrine, *see Nat'l Sec. Archive v. Cent. Intel. Agency*, 104 F.4th 267, 274 (D.C. Cir. 2024) (clarifying that the public domain doctrine is not "separate and distinct from the official acknowledgement doctrine").

### a.    *Morehead request*

CREW first objects to the EOUSA and OPR's *Glomar* responses to its request for records relating to AUSA Morehead.  ECF No. 23-1, at 25-26; *see* ECF No. 23-3, at 156-69.  In another suit in this court, CREW challenged OPR's *Glomar* response to this same request, arguing that DOJ had officially acknowledged the existence of AUSA Morehead's alleged misconduct.  *See Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, No. 24-CV-2416, 2025 WL 2206945, at *2 (D.D.C. Aug. 4, 2025) ("*CREW II*").  Specifically, CREW's request identified testimony in court by the acting U.S. Attorney for the District of Kansas—where AUSA Morehead worked—stating that he was aware of allegations that AUSA Morehead had violated her prosecutorial obligations and that no disciplinary consequences had been imposed for her misconduct.  *See id.*; *see also* ECF No. 23-3, at 158-60 (stating that the acting U.S. Attorney had testified in court that AUSA "Morehead's reputation for veracity is poor" and that "despite evidence of her conduct in both this and other criminal cases, the government ha[d] confirmed that it ha[d] not imposed internal sanctions or discipline against AUSA Morehead on the basis of untruthfulness" (quoting *CCA Recordings 2255 Litig. v. United States*, No. 12-CR-20003-03, 2021 WL 5833911, at *10, *24 (D. Kan. Dec. 9, 2021), *aff'd sub. nom.*, *United States v. Hohn*, 123 F.4th 1084 (10th Cir. 2024) (en banc))).  The court in *CREW II* agreed, finding that the acting U.S. Attorney's testimony "publicly acknowledged Morehead's alleged violations of legal and ethical duties, as well as the lack of discipline she faced," such that DOJ could not "claim 'it would reveal anything not already in the public domain' to say the agency has records related to those alleged violations."  2025 WL 2206945, at *2 (quoting *ACLU II*, 710 F.3d at 430); *see id.* (concluding that the acting U.S. Attorney's statement that "he was 'aware that there have been allegations' of Morehead refusing to provide *Brady* or *Giglio* evidence . . . 'ma[de] it neither logical nor plausible to maintain that

the Agency d[id] not have any documents' related to allegations of misconduct against Morehead" (internal quotation marks omitted)).  The court further explained that the acting U.S. Attorney's public acknowledgments could bind other DOJ components.  *Id.*; *see Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1082 (D.C. Cir. 2012) (holding that if a DOJ prosecutor introduces certain records as evidence in court, other DOJ components may not invoke a FOIA exemption as to those records).

This court, however, takes a different view.  It is true that official disclosures by one component of an agency may bind other components of the same agency, and DOJ does not dispute that rule as it applies to the Morehead request.  But that is only one piece of the inquiry.  The prior disclosure must also "establish[] the *existence* (or not) of records *responsive to the FOIA request*." *Leopold v. Cent. Intel. Agency*, 987 F.3d 163, 170 (D.C. Cir. 2021) (second emphasis added) (quoting *Wolf*, 473 F.3d at 379).  Here, to constitute an official acknowledgment, the acting U.S. Attorney's testimony must have established the existence of DOJ records relating to AUSA Morehead's alleged misconduct as a prosecutor and any DOJ investigation of such misconduct.  *See* ECF No. 23-3, at 167.  Applying the official-acknowledgment test "strictly," *Moore v. Cent. Intel. Agency*, 666 F.3d 1330, 1333 (D.C. Cir. 2011), as it must, the court cannot conclude that the acting U.S. Attorney's testimony stretches that far.  The acting U.S. Attorney stated that he was aware of misconduct allegations against AUSA Morehead, but these statements were made in response to questions about whether the U.S. Attorney's Office had disciplined AUSA Morehead and judicial findings of AUSA Morehead's misconduct as a federal prosecutor. *See* ECF No. 23-3, at 176-89.  And while the acting U.S. Attorney testified about AUSA Morehead's "poor [reputation] for veracity," the attorney questioning him specifically asked him to opine on AUSA Morehead's reputation in the "legal community," referring "not to

21

[the U.S. Attorney's] [O]ffice but the larger legal community." *Id.* at 188. The acting U.S. Attorney did *not* acknowledge any inquiry into AUSA Morehead's alleged misconduct by his office, nor did he state that his office had independently received misconduct complaints or allegations. Put differently, his disclosure of his own awareness of AUSA Morehead's alleged misconduct did not confirm the existence of *DOJ records* about that alleged misconduct.

CREW's official-acknowledgment argument is even weaker with respect to its request for records of AUSA Morehead's alleged misconduct as a Kansas prosecutor and records of any DOJ investigations of AUSA Morehead in that capacity. *See id.* at 167. The acting U.S. Attorney's testimony was limited to AUSA Morehead's tenure as a federal prosecutor, *see id.* at 185 (attorney's statement "limiting this [questioning of the acting U.S. Attorney] to when [AUSA Morehead] was a federal prosecutor"), so it did not match the requested information in CREW's request. As the court in *CREW II* observed, *see* 2025 WL 2206945, at *2, the acting U.S. Attorney stated that he was "not aware of any disciplinary action taken [against AUSA Morehead] at any time for untruthfulness," ECF No. 23-3, at 186; *see id.* at 177-87. But that disclosure does not confirm that his office—or any other DOJ component—ever investigated or contemplated sanctioning AUSA Morehead. Accordingly, based on the acting U.S. Attorney's testimony, it is entirely "'logical' [and] 'plausible,'" *ACLU II*, 710 F.3d at 431, for DOJ to maintain that the EOUSA and OPR do not have documents about AUSA Morehead's alleged misconduct as a federal or state prosecutor or about any DOJ investigation of her.

Finally, DOJ's declarations further belie CREW's assertion that the EOUSA and OPR—the components that responded to the Morehead request—systematically ignore official acknowledgments. DOJ offers two declarations from Vinay J. Jolly, an Attorney Advisor at the EOUSA, to explain the component's approach to official acknowledgments. ECF Nos. 18-6, 29-1.

22

Mr. Jolly avers that in assessing whether a *Glomar* response is appropriate, the "EOUSA determines whether there has been a public disclosure of the investigation."  ECF No. 29-1, at 2 ¶ 5.  "In determining whether the investigation has been officially acknowledged, EOUSA searches DOJ public websites, official government press releases, and news articles referencing a verifiable acknowledgement from an official of the government authorized to make such statements[,] and consults with the individual U.S. Attorney's Office . . . ."  *Id.* at 2 ¶ 6.  As for OPR, DOJ offers a declaration from OPR Senior Associate Counsel Margaret S. McCarty, who asserts that OPR "conducted open-source research and did not find any acknowledgment by DOJ of an investigation into Ms. Morehead's conduct."  ECF No. 29-2, at 5 ¶ 22 ("[A] district court later disagreed with OPR's reasoning and found that, although there was no reference to an OPR investigation specifically, there was evidence of public acknowledgment by the acting United States Attorney of alleged legal and ethical wrongdoing by Ms. Morehead.").  CREW offers no evidence of bad faith to rebut the presumption of good faith afforded to these declarations.  *See SafeCard Servs.*, 926 F.2d at 1200.[9]

---

[9] DOJ argues that the EOUSA's response to the Morehead request was a categorical denial, not a *Glomar* response.  ECF No. 29, at 7 n.1.  The court previously rejected this argument, concluding that the EOUSA's use of hypothetical language effectively functioned as a *Glomar* response because it neither confirmed nor denied the existence of responsive records.  *See* ECF No. 12, at 16-17 (explaining that while the response "stops short of explicitly invoking the *Glomar* language, it all but refuses to confirm or deny the existence of CREW's requested records").  CREW also points out that in the *CREW II* litigation, DOJ described both the EOUSA and OPR's responses as *Glomar* responses in a joint status report.  ECF No. 23-1, at 23; *see* ECF No. 23-3, at 171 ("Defendant (both DOJ components EOUSA and OPR) did not confirm or deny the existence of responsive records or conduct searches for records responsive to Plaintiff's FOIA request . . . ."); Joint Status Report ¶ 2, *CREW II*, No. 24-CV-2416 (D.D.C. Nov. 13, 2024), ECF No. 9.  The *CREW II* court, however, evaluated the EOUSA's response as a categorical denial.  *See* 2025 WL 2206945, at *3-4.  The court adheres to its view that the EOUSA's response was a *Glomar* response, but, for the reasons explained above, it finds that the EOUSA did not improperly ignore an official acknowledgment as CREW asserts.

b.      *Kelsey request*

Next, CREW challenges the Criminal Division's *Glomar* response to its request for records relating to DOJ's investigation of Tennessee State Senator Kelsey that mentioned, among others, Amanda Bunning and Josh Smith.  ECF No. 23-1, at 26-27; *see* ECF No. 23-3, at 147-54.  CREW asserts that its FOIA request alerted DOJ that "it was public knowledge that Bunning was 'listed in the [Kelsey] indictment' as someone who received and passed along information in the course of his criminal conspiracy."  ECF No. 23-1, at 27 (alteration in original).  As for Mr. Smith, CREW claims that its request identified a DOJ press release that named Mr. Smith as a co-conspirator of Mr. Kelsey and discussed Mr. Smith's guilty plea.[10]  ECF No. 23-1, at 26; *see* ECF No. 23-3, at 148.  CREW therefore argues that DOJ officially acknowledged the existence of records relating to both Ms. Bunning and Mr. Smith.  ECF No. 23-1, at 27.

To begin, the court finds that DOJ did not officially acknowledge the existence of responsive records about Ms. Bunning.  CREW's request cited a news article about Senator Kelsey's guilty plea in which the news outlet stated that it had obtained a copy of a subpoena in the case seeking documents related to Ms. Bunning, among others.  ECF No. 18-3, at 14; *see* Sam Stockard, *Ex-Sen. Brian Kelsey Pleads Guilty to Two Counts of Federal Campaign Finance Violations*, Tenn. Lookout (Nov. 22, 2022).[11]  But this news article falls far short of satisfying the official-acknowledgment test, which requires an official disclosure by the agency *from which information is being sought*.  *See Knight First Amend. Inst.*, 11 F.4th at 815-16.  An agency's official acknowledgment cannot be established based on disclosures by other agencies,

---

[10] CREW asserts that its request identified "two DOJ press releases" relating to Mr. Smith, but its request cited only one press release.  ECF No. 23-1, at 26 (emphasis omitted); *see* ECF No. 23-3, at 148 n.1.

[11] *Available at* https://perma.cc/Q29A-M42Y.

*see Frugone v. Cent. Intel. Agency*, 169 F.3d 772, 774-75 (D.C. Cir. 1999), or other branches of government, *see Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982)—let alone reporting in the news media, *see EPIC I*, 678 F.3d at 933 n.5 ("[T]he national media are not capable of waiving [an agency's] statutory authority to protect information related to its functions and activities."); *see also Fitzgibbon*, 911 F.2d at 765 ("It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975))).  Accordingly, a statement in a news article about an alleged subpoena referencing Ms. Bunning cannot be considered "tantamount to an acknowledgment that the [Criminal Division] has documents on the subject." *ACLU II*, 710 F.3d at 431.

The news article also contains the statement that Ms. Bunning appeared in Senator Kelsey's indictment "as an individual who received information from [Senator Kelsey] and passed it on to . . . others." Stockard, *supra*.  But Ms. Bunning's name does not appear in the public indictment against Mr. Kelsey, *see* Indictment, *United States v. Kelsey*, No. 3:21-CR-264 (M.D. Tenn. Oct. 22, 2021), ECF No. 1, or the DOJ press release announcing Mr. Kelsey's indictment, *see* U.S. Dep't of Just., *Tennessee State Senator Pleads Guilty to Campaign Finance Scheme* (Nov. 22, 2022) ("DOJ Kelsey Press Release").[12]  While the media may have inferred that Ms. Bunning was an unnamed individual in the indictment, the indictment's references to unnamed individuals cannot constitute an official disclosure of the existence of records about Ms. Bunning. *See Moore*, 666 F.3d at 1334 (stating that "[a]n agency's official acknowledgement . . . cannot be

---

[12] *Available at* https://perma.cc/ZKA9-T5TW.

based on . . . speculation, no matter how widespread" (alterations in original) (quoting *Wolf*, 473 F.3d at 378)).

As for the part of CREW's request referring to Mr. Smith, there can be no dispute that DOJ's press release announcing Mr. Smith's guilty plea as one of Mr. Kelsey's co-conspirators constitutes an official acknowledgment of the existence of responsive records about Mr. Smith. *See* DOJ Kelsey Press Release, *supra*. The press release states that the Criminal Division's Public Integrity Section was prosecuting the case against Mr. Smith and Mr. Kelsey, *see id.*, making the existence of responsive Criminal Division records relating to Mr. Smith "plain on the face of the official statement," *James Madison Project*, 302 F. Supp. 3d at 22. Indeed, DOJ does not attempt to argue that a *Glomar* response would have been appropriate to the part of CREW's request referring to Mr. Smith. *See generally* ECF Nos. 18-1, 29. DOJ instead maintains that it issued a categorical denial, not a *Glomar* response, which used "to the extent" language. ECF No. 18-1, at 8 n.2; *see* ECF No. 18-3, at 3-4, 8-9 ¶¶ 8, 20. DOJ emphasizes that the Criminal Division's response used explicit *Glomar* language for the rest of the request and different, "categorical" language for the part regarding Mr. Smith, and the court must give effect to those different wordings. *See* ECF No. 29-1, at 7 n.1. But, as the court previously found, "to the extent" phrasing refers to records "hypothetically without confirming or denying their existence." ECF No. 12, at 16-17. The Criminal Division's response therefore declines to confirm or deny the existence of responsive records—or acknowledge whether it had conducted a search—as to records referring to Mr. Smith and is effectively a *Glomar* response. *See Cobar v. U.S. Dep't of Just.*, 953 F. Supp. 2d 1, 3-4 (D.D.C. 2013) (treating the same language from OIP as a *Glomar* response); *see also Tower v. U.S. Customs & Border Prot.*, No. 23-CV-204, 2024 WL 3967322, at *4 (D.D.C. Aug. 28, 2024) (assuming that an agency's response was a *Glomar* response where it was

"not a model of clarity" and could be construed as a *Glomar* or a categorical denial); *Raw Story v. U.S. Dep't of Def.*, No. 23-CV-2514, 2024 WL 4346214, at \*10 (D.D.C. Sep. 30, 2024) ("Indeed, the court does not understand how Defendants can claim a categorical exemption for records it has not yet searched for and identified."). *But see Carzoglio v. Exec. Off. for U.S. Att'ys*, No. 24-CV-2080, 2026 WL 295387, at \*2 (D.D.C. Feb. 4, 2026) (treating same language as a categorical denial).

The court agrees with CREW on one additional point: the Criminal Division's general approach to official acknowledgments appears to be too narrow. DOJ offers a declaration from Courtney O'Keefe, Deputy Chief of the Criminal Division's FOIA/Privacy Act ("PA") Unit, to explain the Criminal Division's process for issuing *Glomar* responses. *See* ECF No. 18-3. Ms. O'Keefe states that, as part of its *Glomar* analysis, the Criminal Division considers whether there has been an "official acknowledgment *by the Criminal Division* of a law enforcement investigation of the subject of the request." *Id.* at 6 ¶ 11 (emphasis added). This suggests that the Criminal Division considers only its own official acknowledgments, *see* ECF No. 23-1, at 15, and Defendants do not argue otherwise, *see* ECF No. 29, at 3. But, as noted, a disclosure by any DOJ component may bind the Criminal Division, so long as the prior disclosure establishes the existence or nonexistence of responsive records. *See Knight First Amend. Inst.*, 11 F.4th at 817 ("[A] disclosure by one component of an executive department may bind 'another component *within*' the same department." (quoting *Marino*, 685 F.3d at 1082)). Put differently, if a disclosure is "'made by an authorized representative of the agency's parent,' it is 'official' as to the subordinate agency." *Id.* at 816 (quoting *ACLU II*, 710 F.3d at 429 n.7). Applied here, the Criminal Division cannot limit its consideration of official acknowledgments to only Criminal Division disclosures. With respect to the Kelsey request, it is not clear whether this overly narrow

27

focus caused the Criminal Division to err in processing the request, since the Criminal Division's parent, DOJ, officially acknowledged Mr. Smith's indictment and there was no official acknowledgment by any component regarding Ms. Bunning. The court will nonetheless consider the Criminal Division's narrow approach to official acknowledgments—along with its response to CREW's request regarding Mr. Smith—in evaluating CREW's policy-or-practice claim. *See infra* Section IV.B.3.

### c.    *Fortenberry request*

CREW also objects to the Criminal Division's and EOUSA's responses to its request for records relating to the investigation of former Representative Fortenberry. ECF No. 23-1, at 27-28; *see* ECF No. 23-3, at 191-202. CREW argues that a U.S. Attorney's Office press release announcing Representative Fortenberry's indictment, which CREW cited in its FOIA request, constitutes an official acknowledgment of the existence of responsive records. ECF No. 23-3, at 191; *see* U.S. Att'y's Off., Cent. Dist. of Cal., *U.S. Rep. Jeff Fortenberry Charged with Scheme to Deceive Federal Investigators Probing Illegal Campaign Contributions in 2016* (Oct. 19, 2021) ("USAO Fortenberry Press Release").[13]

Beginning with the Criminal Division's *Glomar* response, ECF No. 23-3, at 201-02, DOJ argues that the press release "does not indicate any involvement by the Criminal Division," ECF No. 29, at 6. The Criminal Division therefore "issued a partial *Glomar* to the extent CREW was requesting Criminal Division records beyond the scope of the investigation by EOUSA and maintained that any request for records associated with the press release were misdirected to the Criminal Division." ECF No. 29, at 6-7. The court agrees. If the U.S. Attorney's Office's press

---

[13] *Available at* https://perma.cc/JD4Z-T425.

release had confirmed the Criminal Division's involvement in the DOJ investigation of Representative Fortenberry—as the press release for Mr. Smith did—then it would have officially acknowledged the existence of Criminal Division records responsive to CREW's request. But "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by [CREW] must already be in the public domain by official disclosure." *Morley v. Cent. Intel. Agency*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) (quoting *Wolf*, 473 F.3d at 378). For example, in *Marino*, a DOJ component had made a specific reference to an investigation by *another* DOJ component, waiving both components' right to invoke a *Glomar* response. *See* 685 F.3d at 1082. Here, however, the U.S. Attorney's Office's press release states that the FBI, Internal Revenue Service, and U.S. Attorney's Office were investigating and prosecuting Representative Fortenberry, with no mention of the Criminal Division. *See* USAO Fortenberry Press Release, *supra*. While the FBI and U.S. Attorney's Office "are both arms of the DOJ, 'there is no basis to conclude . . . that the [*Criminal Division*] conducts all government investigations mentioned by other components of DOJ.'" *Webster v. Fed. Bureau of Investigation*, No. 24-CV-387, 2025 WL 2144099, at *3 (D.D.C. July 29, 2025) (first alteration in original) (quoting *Donato v. Exec. Off. U.S. Atty's*, No. 16-CV-632, 2021 WL 5161740, at *4 (D.D.C. Nov. 5, 2021)). CREW therefore fails to establish that the Criminal Division investigated Representative Fortenberry, and the Criminal Division correctly declined to treat the U.S. Attorney's press release as an official acknowledgment. *See id.* (holding that the U.S. Attorney's Office for the District of Columbia's public disclosure of an investigation did not waive the FBI's right to issue a *Glomar* response regarding any FBI investigation); *Greenspan v. Exec. Off. for U.S. Att'ys*, No. 23-CV-1816, 2025 WL 1040834, at *7 (D.D.C. Apr. 8, 2025) (concluding that an official disclosure confirming that the FBI had investigated an individual did not constitute an

official acknowledgment that another DOJ component, the Drug Enforcement Administration, had investigated him); *Donato*, 2021 WL 5161740, at \*4 (finding that Bureau of Prisons documents describing an investigation did not constitute an official acknowledgment of an FBI investigation). To be sure, the U.S. Attorney's Office's press release may have diminished Representative Fortenberry's privacy interest in the existence of Criminal Division records, but that is a separate issue from whether it ignored official acknowledgments, as CREW asserts.

As for the EOUSA's response to CREW's request, DOJ maintains that the EOUSA issued a categorical denial, not a *Glomar* response. ECF No. 29, at 7. Again, DOJ does not attempt to argue that a *Glomar* response from the EOUSA would have been proper, and it does not rely on *Glomar* in the alternative. Nor could it, since the U.S. Attorney's Office's prosecution of Representative Fortenberry is public. *See* USAO Fortenberry Press Release, *supra*. Mr. Jolly avers in his declaration that the EOUSA "issued a categorical denial" in response to the Fortenberry request "after weighing the asserted public interest with Mr. Fortenberry's privacy interests." ECF No. 29-1, at 2 ¶ 8. His declaration also restates that, before issuing a *Glomar* response, the EOUSA determines whether DOJ has officially acknowledged an investigation. *Id.* at 2 ¶¶ 5-6. The declaration does not explicitly state why the EOUSA opted for, in its view, a categorical denial, but it implies that the EOUSA did so after determining that DOJ had officially acknowledged the investigation of Representative Fortenberry, which is consistent with CREW's view. *See id.* Accordingly, the court does not find that this example supports CREW's claim that the EOUSA systematically ignores official acknowledgments. The court notes, however, that DOJ may easily avoid similar disputes in the future by expressly recognizing the existence of responsive records when it wishes to issue a categorical denial, as many of its components already do. *See, e.g.*, ECF No. 22-3, at 14 (FBI's initial response to CREW's request for records relating to

Representative Gaetz, stating that the FBI "ha[d] completed its search" and the records were "categorically denied").

### d.    Evans request

Finally, CREW challenges the EOUSA's *Glomar* response to its request for the case file from the criminal prosecution of former West Virginia House Delegate Derrick Evans. ECF No. 23-1, at 28; *see* ECF No. 23-3, at 204-10. CREW emphasizes that DOJ cannot refuse to confirm or deny the existence of a "completed public prosecution." ECF No. 23-1, at 28; *see* U.S. Att'y's Off., D.C., *West Virginia Man Pleads Guilty to Felony Charge for Offenses Committed During Jan. 6 Capitol Breach* (Mar. 18, 2022).[14]

DOJ argues—and the court agrees—that the EOUSA's response was a categorical denial, not a *Glomar* response. ECF No. 29, at 7. The EOUSA's response stated that "[r]ecords pertaining to a third party generally cannot be released without the express authorization and consent of the third party, proof that the subject of [the] request is deceased, or a clear demonstration that the public interest in the disclosure outweighs the personal privacy interest and that significant public benefit would result from the disclosure of the requested records." ECF No. 23-3, at 209. It further stated that without any of the required evidence for releasing records concerning a third party, the release of responsive records "would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C. § 552a" and that "[t]hese records are also generally exempt from disclosure" under Exemptions 6 and 7(C). *Id.* The EOUSA also stated that it would conduct a search for responsive public records if requested. *Id.*

---

[14] *Available at* https://perma.cc/J3BD-L7G9.

Like DOJ's other contested categorical denials, the EOUSA's response lacks any explicit acknowledgment of the existence of responsive records, admission that a search occurred, or statement that the records are "categorically denied." *Cf. Jurdi*, 485 F. Supp. 3d at 90, 92 (treating as a categorical denial an agency's response that "confirm[ed] that records exist" (alteration in original) (internal quotation marks omitted)). Nevertheless, the response lacks the hypothetical "to the extent that records exist" language contained in the other contested responses. And DOJ components frequently use language similar to the EOUSA's response to categorically deny FOIA requests for third-party records, which courts have consistently treated as categorical denials, not *Glomar* responses. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 840 F. Supp. 2d 226, 228, 230 (D.D.C. 2012) ("*CREW III*") (treating an identical response from the FBI as a categorical denial); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F. Supp. 2d 63, 68, 71 (D.D.C. 2012) (treating an identical response from the EOUSA as a categorical denial); *Black v. U.S. Dep't of Just.*, 69 F. Supp. 3d 26, 31, 40 (D.D.C. 2014) (same), *aff'd*, No. 14-5256, 2015 WL 6128830 (D.C. Cir. Oct. 6, 2015).

### 2.    Application of Exemptions 6 and 7(C)

CREW also contends that DOJ improperly invokes FOIA Exemptions 6 and 7(C) when determining whether to issue a *Glomar* response. Exemption 6 permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). Both exemptions require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the

requested information." *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)). Exemption 7(C) "provides broader privacy protection than Exemption 6 and thus 'establishes a lower bar for withholding material.'" *CREW I*, 746 F.3d at 1091 n.2 (quoting *ACLU I*, 655 F.3d at 6). Accordingly, "when both Exemptions 6 and 7(C) could apply to all of the requested records, courts will 'confine [the] analysis to Exemption 7(C).'" *United for FBI Integrity v. U.S. Dep't of Just.*, No. 22-CV-2885, 2024 WL 961001, at *6 (D.D.C. Mar. 6, 2024) (alteration in original) (quoting *PETA*, 745 F.3d at 541). Here, CREW agrees that the court may focus its analysis on Exemption 7(C) because DOJ invoked *Glomar* responses under both provisions. *See* ECF No. 23-1, at 7.

As a threshold matter, to withhold records pursuant to Exemption 7(C), an agency must show "that the records were compiled for a law enforcement purpose." *Pinson v. U.S. Dep't of Just.*, 245 F. Supp. 3d 225, 249 (D.D.C. 2017) (quoting *Kay v. Fed. Commc'ns Comm.*, 976 F. Supp. 23, 37 (D.D.C. 1997)). "To establish a law enforcement purpose, [an agency's] declarations must establish (1) 'a rational nexus between the investigation and one of the agency's law enforcement duties;' and (2) 'a connection between an individual or incident and a possible security risk or violation of federal law.'" *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 926 (D.C. Cir. 2003) (quoting *Campbell v. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

Once an agency establishes that the requested records fall under Exemption 7(C), the agency must then show that disclosure of the requested information "would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33 (D.C. Cir. 2002) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). Where "no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d

33

at 874.  If the court concludes that a substantial privacy interest is at stake, the court must then "balance the . . . privacy interest against the public interest in disclosure."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) ("*EPIC II*") (alteration in original) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004)).

The D.C. Circuit has recognized the "'substantial' privacy interest held by 'the targets of law-enforcement investigations . . . in ensuring that their relationship to the investigations remains secret.'"  *PETA*, 745 F.3d at 541 (alteration in original) (quoting *Roth*, 642 F.3d at 1174); *see CREW I*, 746 F.3d at 1091 ("[I]ndividuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." (alteration in original) (quoting *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995))).  The mere "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."  *Roth*, 642 F.3d at 1174 (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003)).  Accordingly, when a FOIA request "is made for . . . investigative records regarding a particular individual, the [agency's] mere acknowledgment that it possesses responsive records associates the individual named in the request with suspected criminal activity and therefore a *Glomar* response may be appropriate."  *CREW I*, 746 F.3d at 1091.  This privacy interest exists "regardless of whether the person might be implicated as the *target* of a law-enforcement investigation or merely a *witness*."  *Prop. of People v. U.S. Dep't of Just.*, 310 F. Supp. 3d 57, 68 (D.D.C. 2018); *see Roth*, 642 F.3d at 1174 (explaining that "not only the targets of law-enforcement investigations, but also 'witnesses, informants, and . . . investigating agents' have a 'substantial interest' in ensuring that their relationship to the investigations 'remains secret'" (alteration in original) (quoting *Schrecker*, 349 F.3d at 666)).    Accordingly,

"Exemption 7(C) allows agencies to conceal the existence of responsive documents if the presence of such records in the agency's system would 'associate the individual named in the request with criminal activity' or otherwise compromise the person's privacy." *Prop. of People*, 310 F. Supp. 3d at 68 (quoting *Nation Mag.*, 71 F.3d at 893). As relevant here, "public officials 'may have a somewhat diminished privacy interest' in the Exemption 7(C) balancing analysis," *EPIC II*, 18 F.4th at 719 (quoting *CREW I*, 746 F.3d at 1092), but they "do not surrender all rights to personal privacy when they accept a public appointment," *CREW I*, 746 F.3d at 1092 (quoting *Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)).

On the other side of the balancing test, the "public interest to be weighed against the privacy interest . . . is the extent to which disclosure would serve the core purposes of the FOIA by contribut[ing] significantly to public understanding of the operations or activities of the government." *Nat'l Ass'n of Home Builders*, 309 F.3d at 33 (first alteration in original) (internal quotation marks omitted); *see Davis*, 968 F.2d at 1282 ("It is well established that the only public interest relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens' right to be informed about what their government is up to.'" (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989))). The public interest includes an understanding of the manner in which the federal government "handle[s] the investigation and prosecution of crimes that undermine the very foundation of our government." *CREW I*, 746 F.3d at 1093.

CREW cites six of its requests to support its assertion that DOJ fails to consider evidence showing a public official's privacy interests have been diminished. *See* ECF No. 23-1, at 29-34.[15] According to CREW, DOJ's failure takes two forms: DOJ ignores (1) evidence that the subject of

---

[15] CREW relies on the Mastriano, Egyptian President, Giuliani/Kallstrom, Morehead, Kindred, and Zinke requests. ECF No. 23-1, at 29-34.

an investigation has publicly disclosed that they were under investigation and (2) evidence in the "public record" acknowledging the existence of an investigation. *Id.* at 11, 29-34. CREW separately contends that DOJ improperly requires FOIA requesters to establish a "significant" or "overriding" public interest in disclosure to overcome Exemptions 6 and 7(C). *Id.* at 16-19 (citing its own requests and other FOIA cases in this district where DOJ enforced this requirement). The court agrees that several of CREW's requests reveal potential deficiencies in DOJ's processing of FOIA requests, although it understands the scope of those deficiencies differently.

### a.   Subject's acknowledgment

The parties do not dispute that, generally speaking, "an individual's 'well-publicized announcement' that he was the subject of an investigation diminishes his privacy interest in 'that very fact.'" *Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 21-CV-2201, 2022 WL 4182189, at *7 (D.D.C. Sep. 13, 2022) (quoting *CREW I*, 746 F.3d at 1092); *see Tower*, 2024 WL 3967322, at *6 (collecting cases where an individual's "affirmative public disclosures significantly diminish[ed]" the individual's privacy interest). For example, in *CREW I*, the D.C. Circuit considered a FOIA request for files related to an FBI investigation of Tom Delay, the former Majority Leader of the House of Representatives. 746 F.3d at 1087. Mr. DeLay had made "public statements confirming the fact that he had been, but was no longer, under investigation." *Id.* at 1091. The Court concluded that a *Glomar* response was inappropriate because "the FBI's acknowledgement that it had responsive records would not itself cause harm by confirming" a fact that Mr. DeLay had already made public. *Id.* at 1092.

CREW argues that, for the Mastriano, Egyptian President, and Giuliani/Kallstrom requests, the FBI ignored evidence showing that the subject of an investigation had publicly disclosed that he was under investigation, which eliminated the subject's privacy interest. ECF No. 23-1,

at 29-32.  The court agrees that, for the Mastriano and Egyptian President requests, DOJ has not adequately explained whether the FBI considered statements by the subject's spokesperson disclosing the existence of an investigation.  With respect to the Giuliani/Kallstrom requests, DOJ has provided no justification at all for the FBI's *Glomar* response, leaving the court to question whether the FBI even evaluated the threshold requirements for Exemptions 6 and 7(C), let alone considered the subjects' public statements disclosing the existence of responsive records.

*Mastriano request*.  CREW first cites its request for records relating to Pennsylvania State Senator Mastriano's interviews with the FBI and any DOJ investigation of Senator Mastriano.  *Id.* at 29-30; *see* ECF No. 18-4, at 20-22.  The FBI issued its "standard" *Glomar* response to the request, ECF No. 18-4, at 27, and CREW appealed, *id.* at 31-35.  OIP remanded the request "for further review" of the first part of CREW's request regarding interview records and upheld the *Glomar* response as to the remaining parts.  *Id.* at 39-40.  On remand of the first part, the FBI stated that CREW had "requested records on a third[-]party individual that is exempt from disclosure pursuant to" Exemptions 6 and 7(C) and closed the request.  *Id.* at 44.

CREW contends that the FBI's determinations were improper because Senator Mastriano's attorney had "publicly acknowledged [that Senator Mastriano's interview with the FBI] took place," eliminating Senator Mastriano's privacy interest in that fact.  *Id.* at 33; *see* ECF No. 23-1, at 30.  CREW's request cited a news article that quoted the attorney as stating, "[Senator Mastriano] previously was approached and sat for a voluntary interview with the FBI and told them the truth about everything that happened [on January 6]. . . .  The FBI cleared him."

Farnoush Amiri & Marc Levy, *Mastriano Willing to Talk to Jan. 6 Committee, Spoke to FBI*, Associated Press (June 2, 2022).[16]

DOJ does not meaningfully respond to CREW's assertion that the agency failed to consider whether Senator Mastriano's attorney's statements materially diminished Senator Mastriano's privacy interest—at least with respect to the existence of records about his interview with the FBI. *See* ECF No. 18-4, at 10 ¶ 16 (Acting Section Chief of the FBI's Record/Information Dissemination Section Shannon R. Hammer's declaration stating that CREW "did not provide sufficient evidence of an official disclosure of the requested information by Senator Mastriano, DOJ, or FBI"). Senator Mastriano's attorney confirmed that the FBI had interviewed the senator, eliminating his privacy interest in the existence of those interview records. *See CREW I*, 746 F.3d at 1092 (concluding that because the third-party subject's "public statements confirmed he had been under investigation, the FBI's acknowledgment that it had responsive records would not itself cause harm by confirming that fact, rendering a *Glomar* response inappropriate"). While "individuals have substantial privacy interests in relation to being associated with law enforcement investigations because any such association can engender comment, speculation, or harassment which can be embarrassing or stigmatizing," ECF No. 18-4, at 4 ¶ 6, an agency is still required to show that such substantial privacy interests exist based on the individual circumstances of the request and third-party subject, *see Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 66 (D.C. Cir. 2018) (explaining that an agency has an "obligation to specifically identify the privacy interest at stake, which can vary based on many factors, including frequency, nature, and severity of the allegations"). Here, it is difficult to see how Senator Mastriano could have been harmed by the

---

[16] *Available at* https://perma.cc/KUB6-DTYV.

FBI's disclosure of the existence of records of his FBI interview after his own attorney had confirmed that the interview had taken place, and Ms. Hammer's declaration does not state if or how the FBI considered the effect of those statements on the privacy interests at stake.[17]

In fact, Ms. Hammer's declaration implies that the FBI only deemed Senator Mastriano's attorney's statements relevant *after* CREW had shown a strong public interest. ECF No. 18-4, at 12-13 ¶ 22 (explaining that the FBI rescinded its *Glomar* response on remand because CREW had submitted additional statements about the public interest in disclosure in its appeal). But the FBI was required to show a substantial privacy interest at the outset, before considering whether a public interest in disclosure might exist. *See PETA*, 745 F.3d at 542 ("In light of the substantial privacy interests at stake, Exemption 7(C) authorizes a *Glomar* response unless the public interest in disclosure is strong enough to justify the privacy invasion"); *Greenspan*, 2025 WL 1040834, at *12 ("Here, defendants fail at the first step of the inquiry: establishing a cognizable privacy interest to support their *Glomar* responses."). Ms. Hammer never explains why the FBI concluded that Senator Mastriano had a substantial privacy interest in keeping secret the fact that he had been interviewed by the FBI. Instead, the FBI concluded that Senator Mastriano had a "cognizable privacy interest in *any* investigatory records the FBI may or may not have concerning him." ECF No. 18-4, at 10 ¶ 16 (emphasis added). Ms. Hammer never acknowledges whether the FBI

---

[17] CREW also objects to the FBI's requirement of an "official" disclosure by the third-party subject, arguing that "[n]othing in the legal standards regarding *Glomar* responses requires a *subject's acknowledgment* of an investigation into him or her to be 'official' (whatever that means, and the DOJ does not say)." ECF No. 23-1, at 30. But Ms. Hammer explains how the FBI determines whether a subject's acknowledgment diminishes his privacy interest, stating in her declaration that the FBI considers "verified statements from [elected officials] or their authorized spokesperson[s], in instances when the third[]party is an elected official" and "news articles referencing a verifiable acknowledgment . . . made by the third[]party themselves." ECF No. 18-4, at 5 ¶ 7.

*initially* considered Senator Mastriano's attorney's statements and how they might have diminished Senator Mastriano's privacy interest in the existence of interview records specifically. *See id.* at 13 ¶ 23. Rather, she simply states that the FBI "reconsidered" Senator Mastriano's attorney's statements on remand, *after* CREW had appealed. *Id.* This suggests that in its first analysis, the FBI ignored indicia of Senator Mastriano's diminished privacy interest at the outset.[18]

That said, to the extent CREW argues that the attorney's statements eliminated Senator Mastriano's privacy interests in the existence of an FBI *investigation*, CREW is incorrect. The attorney's disclosure was limited to the existence of Senator Mastriano's voluntary interview with the FBI, and it did not, as CREW asserts, confirm that Senator Mastriano was the subject of an FBI investigation. *See* ECF No. 23-1, at 30. Because his attorney did *not* disclose that Senator Mastriano "was ever the target of an FBI investigation outside of his association with the [voluntary interview]," Senator Mastriano had "more than a *de minimis* privacy interest in the existence of any FBI investigative records outside of the [interview] [his lawyer] publicly acknowledged." *Prop. of the People, Inc. v. Dep't of Just.*, No. 17-CV-1728, 2021 WL 6105680, at *6 (D.D.C. Dec. 23, 2021); *see Codrea*, 2022 WL 4182189, at *7 (concluding that a subject's public statements acknowledging a police investigation did not diminish his privacy interest regarding whether he was the subject of a Bureau of Alcohol, Tobacco, Firearms and Explosives investigation); *Lindsey v. Fed. Bureau of Investigation*, 490 F. Supp. 3d 1, 19-20 (D.D.C. 2020) (concluding that the subject retained his privacy interest in not being associated

---

[18] Because the court agrees with CREW that the FBI's initial *Glomar* response was flawed, it need not address the parties' dispute over whether, on remand, the FBI issued a "rephrased *Glomar* response," ECF No. 23-1, at 30, or a categorical denial, ECF No. 18-1, at 12; *see* ECF No. 18-4, at 44 (stating on remand that CREW had "requested records on a third party individual that is exempt from disclosure pursuant to" Exemptions 6 and 7(C)).

with FBI investigative records when he had made statements about being detained and questioned by law enforcement officials but had not admitted that he was a subject of investigative interest to the FBI).

*Egyptian President request*.  Second, CREW cites the FBI's *Glomar* response to its request for records relating to an investigation into allegations that "Egyptian President Abdel Fatah El-Sisi sought to give $10 million to support former President Donald Trump's 2016 presidential campaign."  ECF No. 23-3, at 213-19; *see* ECF No. 23-1, at 31.  CREW's request cited a news article reporting that DOJ had closed its investigation into whether then-candidate Trump accepted funds from Egypt; the article also quoted a spokesperson for Trump's presidential campaign about the investigation.  ECF No. 23-3, at 214; *see* Aaron C. Davis & Carol D. Leonnig, *$10M Cash Withdrawal Drove Secret Probe into Whether Trump Took Money from Egypt*, Wash. Post (Aug. 2, 2024).[19]  CREW thus contends that the FBI improperly refused to confirm or deny the existence of responsive records about the investigation despite the Trump spokesperson's public statement.  ECF No. 23-1, at 31.

In response, DOJ claims that the *Glomar* response was proper because the article "does not constitute any official or public acknowledgment as it merely references DOJ's and President Trump's spokesperson's refusal to answer any questions regarding the purported investigation."  ECF No. 29, at 8.  But DOJ mischaracterizes the article, as the spokesperson for President Trump's campaign did not merely decline to comment or refuse to answer any questions.  Rather, the spokesperson expressly acknowledged the investigation, stating, "The investigation referenced found no wrongdoing and was closed."  Davis & Leonnig, *supra*.  And a spokesperson

---

[19] *Available at* https://perma.cc/BWX4-J83T.

for the Egyptian government told the news outlet that it was "'inappropriate to comment or refer to rulings issued by the judiciary system or procedures and reports taken by Justice Departments' in other countries . . . [and] emphasized that the Justice Department had closed the investigation without charges." *Id.* While DOJ is correct that the article does not contain an official acknowledgment by DOJ, that "does not mean that the *third-party's* acknowledgment of that information has no bearing on the private-public interest balancing test underlying the FOIA exemptions at issue." *Lindsey v. Fed. Bureau of Investigation*, 271 F. Supp. 3d 1, 8 (D.D.C. 2017); *see Prop. of the People*, 2021 WL 6105680, at *6 (considering a congressman's spokesperson's comments in the private-interest analysis). DOJ does not explain whether the FBI considered these third-party acknowledgments in its determination of the privacy interests implicated by CREW's request. In fact, DOJ does not offer any declaration in support of the FBI's response. The FBI may well have had compelling reasons to issue a *Glomar* response notwithstanding the public acknowledgments by the subjects' spokespersons. *Cf. In re Reps. Comm. for Freedom of the Press*, No. 24-CV-115, 2025 WL 92363, at *7 (D.D.C. Jan. 14, 2025) (concluding that the same news article did not contain "sustained or repeated disclosure by the relevant parties" to justify unsealing of grand jury documents). But since DOJ provides scant explanation for the FBI's conclusion and appears to have misunderstood the meaning of the spokespersons' statements, the court cannot conclude that the FBI considered whether those statements may have diminished the subjects' privacy interests.

*Giuliani/Kallstrom requests*. Third, CREW asserts that the FBI improperly issued *Glomar* responses to its requests for records of "all communications between any agents or employees of the [FBI]" and Mr. Giuliani and Mr. Kallstrom. ECF No. 23-3, at 223, 227; *see* ECF No. 23-1, at 31. CREW's requests cited statements made by Mr. Giuliani and Mr. Kallstrom to news outlets

referring to their conversations with FBI agents about the FBI's investigation of former Secretary of State Clinton. ECF No. 23-3, at 224, 228; *see, e.g.*, Fox News, *Giuliani: Case Is Clearer Against Clinton Foundation; Comey Advisor: His Silence Would've Had Ramifications* (Jan. 23, 2017);[20] Fox News, *FBI Reportedly Upset with Obama over Clinton Server Scandal; Krauthammer Calls POTUS' Remarks on Israel 'Shameful'* (Jan. 24, 2017).[21]

The FBI's responses to these requests highlight a threshold problem with the FBI's approach to *Glomar* responses, which the parties allude to but do not squarely address: the FBI does not explain why Exemptions 6 and 7(C) apply to the requested records in the first place. These requests do not obviously concern "personnel [or] medical files [or] similar files," 5 U.S.C. § 552(b)(6), or "records compiled for law enforcement purposes," *id.* § 552(b)(7)(C). "Not every document compiled by a law enforcement agency, such as the FBI, is compiled for a law enforcement purpose," *Lindsey*, 271 F. Supp. 3d at 6, and DOJ makes no attempt to show that *all* communications between the FBI and these subjects were compiled for law enforcement purposes. Indeed, DOJ does not offer any declaration from the FBI justifying its *Glomar* responses for these requests, and its briefing emphasizes that CREW's requests did *not* relate to any investigations. ECF No. 29, at 8.

Ms. Hammer's declaration about the FBI's general approach to issuing *Glomar* responses also omits any mention of this threshold determination. Ms. Hammer avers that when the FBI receives a FOIA request concerning "third party individuals"—that is, anyone other than the requester—the agency requires the requester to provide proof of death or a written waiver from the third party because individuals have a "substantial privacy interest in not being associated with

---

[20] *Available at* https://perma.cc/4SQ2-LFY3.

[21] *Available at* https://perma.cc/GV6S-Y4QA.

an FBI investigation." ECF No. 18-4, at 3 ¶ 5. But not all records in the FBI's possession that name a third-party individual are law enforcement records, and Ms. Hammer's declaration conspicuously omits that inquiry from the FBI's process. While "an agency whose 'principal function is law enforcement' [like the FBI] is entitled to deference when it claims that records relating to an external investigation were compiled for law enforcement purposes," *United for FBI Integrity*, 2024 WL 961001 at *6 (quoting *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 203 (D.C. Cir. 2014)), the FBI has not made such claims with respect to CREW's requests or in general.

DOJ argues that these requests cannot support CREW's policy-or-practice claim because they do not seek records relating to investigations of public officials. *See* ECF No. 29, at 8. CREW, too, admits that these requests did not seek "records relating to the investigation of a third party." ECF No. 23-1, at 31 (stating that the requests were for records "not of an investigation"). Nevertheless, the court finds the FBI's *Glomar* responses probative in assessing CREW's overarching claim that "the use of [a] public official's name triggers a *Glomar* response" from DOJ components. *Id.* at 21. Here, CREW's requests named two public officials, Mr. Giuliani and Mr. Kallstrom, and DOJ does not explain the basis for its *Glomar* responses. Finally, even assuming that Exemptions 6 and 7(C) applied to the requested records, DOJ does not explain whether it considered Mr. Giuliani and Mr. Kallstrom's public statements about their conversations with FBI agents when weighing the relevant privacy interests.

### b.    Other governmental entities' acknowledgments

CREW next argues that DOJ ignored acknowledgments by other governmental entities, such as federal courts and other agencies, that significantly diminished a subject's privacy interest in the existence of an investigation, making DOJ's invocation of *Glomar* inappropriate. *Id.*

44

at 32-34.  As support, CREW points to DOJ's responses to three of its requests: (1) the Morehead request, ECF No. 23-3, at 156-69; the Kindred request, *id.* at 237-45; and the Zinke request, ECF No. 18-3, at 24-36.  The court concludes that CREW's objections to these responses lack merit but that these requests reveal a separate problem with DOJ components' processing of FOIA requests, which the court discusses in the next section.  *See infra* Section IV.B.2.c.

CREW asserts categorically that "[s]ubjects of investigations suffer *no . . .* harm when . . . their association with the investigation or conduct that is the subject of the request is already a matter of public record."  ECF No. 23-1, at 29 (emphasis added).  The problem with this argument is two-fold: first, CREW assumes that public information about a subject's alleged conduct is sufficient to extinguish that subject's privacy interest in the existence of a DOJ investigation, even where the existence of a DOJ investigation is not public knowledge; and second, CREW fails to recognize that even when information about a DOJ investigation is in the public domain, that only diminishes, but does not eliminate, the subject's privacy interest.

On the first point, CREW incorrectly asserts that public information about the conduct allegedly targeted by a DOJ investigation is sufficient to extinguish a subject's privacy interest in the existence of a DOJ investigation.  Information in the public domain may certainly bear on a subject's privacy interests, but that information must reduce the subject's privacy interest in the existence of the *specific* records being sought.  *See Codrea*, 2022 WL 4182189, at *7 ("[A]n individual's public disclosure of information that could be potentially incriminating in a general sense does not reduce his privacy interest in whether he was the subject of a particular federal criminal investigation by a particular agency.").  As applied here, the existence of a DOJ investigation itself must be a matter of public record to reduce the subject's privacy interest, and even then, the subject's privacy interest may remain intact absent an acknowledgment by the

45

agency or subject. *See Martin v. Dep't of Just.*, 488 F.3d 446, 457 (D.C. Cir. 2007) (explaining that under Supreme Court precedent "a person's privacy interest in law enforcement records that name him is not diminished by the fact that the events they describe were once a matter of public record").[22]

This holds true even when the subject's conduct enters the public domain through another governmental entity's investigation. Indeed, CREW appears to conflate official acknowledgments of DOJ investigations with acknowledgments by *other* governmental entities of their *own* investigations.[23] But information about a non-DOJ investigation is insufficient on its own to eliminate a subject's privacy interest in a *DOJ* investigation. That is because a subject has a distinct privacy interest in the existence of a *criminal* investigation into them. *See CREW I*, 746 F.3d at 1091 (explaining that "[i]f a FOIA request is made for FBI investigative records regarding a particular individual, the FBI's mere acknowledgment that it possesses responsive records associates the individual named in the request with suspected criminal activity").

---

[22] CREW relies on *Bartko* for this point, *see* ECF No. 23-1, at 32-34; ECF No. 31, at 3-4, but that case cuts in the opposite direction. In *Bartko*, the D.C. Circuit held that OPR improperly invoked Exemption 7(C) to withhold records relating to a prosecutor's alleged misconduct in handling the requester's criminal case. 898 F.3d at 68-70. With respect to the balancing of privacy and public interests, the Court held that the prosecutor's privacy interest was "substantially diminished" because "the allegations of misconduct during the [requester's] trial [were] already a matter of public record, as [was] the referral to OPR published in [a judicial] decision, and the U.S. Attorney's public announcement that it too was referring the allegations of misconduct to OPR." *Id.* at 69. The privacy interests were therefore diminished because the fact of the OPR investigation itself, as well as the conduct at issue in the investigation, were matters of public record.

[23] CREW's misunderstanding is understandable, as courts have used the term "public domain exception" as a way of referring to the official acknowledgment doctrine. *See supra* note 8. But the so-called public domain exception does not provide that any information in the public domain confirming the existence of any law enforcement investigation is sufficient to render a *Glomar* response inappropriate. *See Nat'l Sec. Archive*, 104 F.4th at 274 ("[T]he mere public disclosure of information . . . cannot overcome an otherwise valid FOIA exemption.").

The court therefore rejects CREW's categorical rule that public acknowledgments by other governmental entities of a subject's conduct or their own investigation of that conduct eliminate the subject's privacy interest in the existence of a DOJ investigation.[24]  For example, CREW argues that federal courts' acknowledgments of alleged misconduct by AUSA Morehead eliminated her substantial privacy interest in the existence of any DOJ investigation into alleged criminal wrongdoing.  *See* ECF No. 23-1, at 32-33.  AUSA Morehead's privacy interests may be somewhat "lowered because it is public knowledge that [she] has been accused of wrongdoing."  *United for FBI Integrity*, 2024 WL 961001, at \*10.  But none of the court statements cited by CREW acknowledged the existence of a DOJ investigation of AUSA Morehead, meaning she "plainly ha[d] a 'strong privacy interest in avoiding the disclosure of any [EOUSA or OPR] investigation of misconduct.'"  *Id.* (quoting *PETA*, 745 F.3d at 541); *see* ECF No. 18-6, at 4 ¶ 16 (Jolly declaration stating that CREW "merely identified federal court decisions that criticized Ms. Morehead for misconduct, which is not the same as DOJ investigat[ing] Ms. Morehead for misconduct, officially acknowledging any such investigation of Ms. Morehead, or finding that Ms. Morehead committed misconduct"); ECF No. 29-2, at 6 ¶ 24 (McCarty declaration stating that OPR considered "Ms. Morehead's substantial private interest in nondisclosure of any association with a misconduct investigation, if there was one").

Likewise, CREW's assertion that former Judge Kindred's privacy interests evaporated when the Ninth Circuit Judicial Council publicly disclosed its investigation of him also fails.  ECF

---

[24] CREW does not argue that DOJ components improperly balanced the privacy and public interests implicated by the following three requests.  Instead, it argues categorically that no privacy interest existed based on other governmental entities' public acknowledgments.  Accordingly, the court does not address whether DOJ properly weighed the asserted public interests against the privacy interests in nondisclosure.

No. 23-1, at 33-34; *see In re Complaint of Judicial Misconduct*, No. 22-90121 (9th Cir. Jud. Council May 23, 2024), *aff'd*, C.C.D. No. 24-02 (U.S. Jud. Conf. Aug. 22, 2024). But the Ninth Circuit Judicial Council acknowledged the existence of its *own* investigation into Judge Kindred, not the existence of a *DOJ* investigation.  Judge Kindred has a distinct privacy interest in the existence of a criminal investigation, and the fact that "the full extent of his conduct had been authoritatively addressed in a public forum," ECF No. 23-1, at 34, does *not* eliminate his privacy interest in the existence of a law enforcement investigation, *see Martin*, 488 F.3d at 457; *see also Connell v. Cent. Intel. Agency*, 110 F.4th 256, 270 (D.C. Cir. 2024) ("[C]onfirmation that an agency has responsive records (or not) by the agency itself is different from statements to that effect by other sources—*even trusted government sources*—because confirmation by the agency itself removes 'any lingering doubts' on the issue." (emphasis added) (quoting *Knight First Amend. Inst.*, 11 F.4th at 816)).

On the second issue, CREW's argument is based on the faulty legal premise that any information in the public domain about a DOJ investigation is sufficient to eliminate a subject's privacy interest.  The D.C. Circuit has repeatedly emphasized that "the fact that information about [an individual's] case[] is a matter of public record simply makes their privacy interests 'fade,' not disappear altogether." *Am. C.L. Union v. U.S. Dep't of Just.*, 750 F.3d 927, 932 (D.C. Cir. 2014) (quoting *ACLU I*, 655 F.3d at 9); *see Stein v. Cent. Intel. Agency*, No. 17-CV-189, 2024 WL 4298757, at *3 (D.D.C. Sep. 26, 2024) ("It is true that a privacy interest may '*fade* when the information involved already appears on the public record . . . ,' but that 'does not mean that it should receive widespread publicity if it does not involve a matter of public concern.'" (quoting *Reps. Comm. for Freedom of the Press*, 489 U.S. at 763 n.15)).  Assessing a subject's privacy interest in the existence of investigatory records is a fact-specific inquiry that "can vary based on

many factors, including frequency, nature, and severity of the allegations." *Bartko*, 898 F.3d at 66. As relevant here, an external source's acknowledgment of a DOJ investigation may diminish a subject's privacy interest in the existence of a law enforcement investigation, but it generally cannot, on its own, extinguish that privacy interest. *See, e.g.*, *Codrea*, 2022 WL 4182189, at *8 (concluding that "second-hand media reports of [a Bureau of Alcohol, Tobacco, Firearms and Explosives] records inspection [did not] diminish Hunter Biden's privacy interest" in the existence of an agency investigation); *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 394 F. Supp. 3d 111, 118 (D.D.C. 2019) (concluding that a former British intelligence operative retained a privacy interest in whether the FBI suspected him of "some wrongdoing" even though his privacy interests were diminished by public reporting that had "thrust [him] into the spotlight").[25]

*PETA* is instructive on this point. There, the D.C. Circuit rejected a FOIA requester's argument that a university's public acknowledgments of an agency investigation into its researchers eliminated those researchers' privacy interests. 745 F.3d at 542. The Court emphasized that the agency's "own official acknowledgement that it had investigated the named researchers would carry an added and material stigma," so, notwithstanding the university's statements, the researchers retained "substantial privacy interests." *Id.*; *see Hawkins v. Fed. Bureau of Investigation*, No. 20-CV-1483, 2022 WL 905577, at *7 (D.D.C. Mar. 2, 2022)

---

[25] CREW also argues that DOJ's own guidance states that *Glomar* responses are inappropriate "where the subject of a request has already been publicly associated with agency law enforcement matters that would otherwise justify a *Glomar* response." ECF No. 31, at 2 (citation omitted). From this, CREW suggests that any evidence in the "public record" associating the subject of a request with a law enforcement investigation is sufficient to render a *Glomar* response inappropriate. But CREW ignores that in all the cases cited in the DOJ guidance for the quoted proposition, the agency or third-party subject themselves had publicly acknowledged the existence of responsive records. ECF No. 31-1, at 41 n.121; *see CREW I*, 746 F.3d at 1091-92 (subject's public statements); *Kimberlin v. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998) (prosecutor's public acknowledgments of his own disciplinary proceedings).

("Exempt information only lose[s] [its] protective cloak once disclosed and preserved in a permanent public record[] if the information has been officially acknowledg[ed], *i.e.*, made public through an official and documented disclosure." (alterations in original) (citations omitted) (internal quotation marks omitted)).

Accordingly, CREW is also incorrect that the Interior OIG's reference to a possible DOJ investigation extinguished former Secretary Zinke's privacy interest in the existence of such an investigation.  ECF No. 23-1, at 34; *see* ECF No. 18-3, at 29.  The Interior OIG report stated that the agency had "referred [its] findings to [DOJ], which declined prosecution of this matter in the summer of 2021."  Off. of Inspector Gen., U.S. Dep't of Interior, No. 18-890, Former Secretary Did Not Comply with Ethical Obligations and Duty of Candor 3 (Feb. 16, 2022).[26]  CREW claims that the Criminal Division issued a *Glomar* response to its request, ECF No. 23-1, at 34, while DOJ maintains that it categorically denied the request, ECF No. 18-1, at 10; ECF No. 29, at 7 n.1.  The Criminal Division's initial response did not use explicit *Glomar* language, but, again, hypothetical "to the extent" language does not confirm or deny the existence of responsive records and has the same effect as a *Glomar* response.  *See* ECF No. 12, at 17.  Even treating the Criminal Division's response as a *Glomar* response, it is unlikely that the Interior OIG's report *fully* diminished Secretary Zinke's privacy interest in the existence of Criminal Division records about DOJ's decision not to prosecute him.  The report states only that the Interior OIG referred its findings to "DOJ," and CREW points to no acknowledgments by DOJ components or Secretary Zinke confirming the existence of that referral or DOJ's decision not to prosecute.

---

[26] *Available at* https://perma.cc/78NB-W8JP.

*c.*    *Scope of privacy interests*

While the court rejects CREW's sweeping rule about information in the public record eliminating a subject's privacy interest in the existence of a DOJ investigation, it concludes that DOJ's responses to the Morehead, Kindred, and Zinke requests—as well as CREW's request for records relating to investigations of companies owned by President Trump, *see* ECF No. 23-3, at 139-45—reveal a different problem.  Specifically, DOJ has failed to satisfy its obligation to "specifically identify the privacy interest at stake," *Bartko*, 898 F.3d at 66, for *each* requested category of records.

First, the EOUSA's and OPR's responses to the Morehead request do not explain why "the disclosure of *any* record regarding *any* allegation of misconduct," *id.*, would implicate a substantial privacy interest of AUSA Morehead.  CREW's request did not only seek records relating to DOJ investigations of AUSA Morehead but also records pertaining to "alleged violations by AUSA Morehead of . . . the United States Attorney's Manual . . . , any ethical duties imposed upon [her] . . . , or any other professional misconduct."  ECF No. 23-3, at 156-57.  But DOJ's justifications focus solely on her privacy interest in the existence of an *investigation*.  *See* ECF No. 18-6, at 4 ¶ 15 (stating that the EOUSA concluded that AUSA Morehead "had a substantial privacy interest in the requested information because [she is] mentioned in the requested files"); ECF No. 29-2, at 6 ¶ 25 (stating that AUSA Morehead "had strong privacy interests in not being associated with an OPR misconduct investigation, if one existed"); *see also CREW II*, 2025 WL 2206945, at *3 ("Given that this information [about misconduct allegations] is already public, it

51

would not further harm Morehead's privacy for DOJ to confirm or deny the existence of records concerning allegations of misconduct.").[27]

Next, the EOUSA's response to the Kindred request fails to account for the different privacy interests at stake for *all* the requested records. Only one part of CREW's request sought records of "any DOJ investigations, actions . . . , or decisions not to take action, in regard to any communication between Judge Kindred and the AUSA from whom Judge Kindred received nude photographs." ECF No. 23-3, at 238. As noted, the Ninth Circuit Judicial Council did not acknowledge the existence of any DOJ investigation of Judge Kindred, so it did not meaningfully diminish Judge Kindred's privacy interests with respect to a DOJ investigation. But other parts of CREW's request sought communications among employees of the U.S. Attorney's Office for the District of Alaska concerning Judge Kindred's alleged conflicts of interest. *See id.* at 237-38. DOJ's proffered declaration does not explain what privacy interest the EOUSA identified in the existence of such communications, stating only that the agency "conduct[ed] a step-by-step consideration[] [and] issued a *Glomar* response because the disclosure of [the] requested information would constitute an unwarranted invasion of Mr. Kindred's personal privacy under FOIA Exemptions 6 and 7(C)." ECF No. 29-1, at 3 ¶ 11. Accordingly, DOJ has not shown why a blanket *Glomar* was appropriate. *See PETA*, 745 F.3d at 545 (explaining that when there is "a category of responsive documents for which a *Glomar* response would be unwarranted, [an agency's] assertion of a blanket *Glomar* response to [that part of the] request cannot be sustained").

---

[27] The *CREW II* court did not parse the different parts of CREW's request and instead found that OPR's blanket *Glomar* response was not appropriate because of the information in the public record. *See* 2025 WL 2206945, at *3-4.

Third, while the court agrees with DOJ that the Interior OIG report did not fully eliminate Secretary Zinke's privacy interest in the existence of a DOJ investigation, CREW's request did not only seek records relating to an investigation—it also sought records relating to the Interior OIG's *referral* to DOJ concerning Secretary Zinke.  ECF No. 18-3, at 29.  And Secretary Zinke's privacy interest in the existence of records concerning the Interior OIG's referral was substantially diminished when the Interior OIG confirmed that it had referred its findings to DOJ.  But DOJ offers no meaningful explanation for whether and how the Criminal Division "specifically identif[ied] the privacy interest at stake" for that and other parts of the Zinke request.  *Bartko*, 898 F.3d at 66.  Ms. O'Keefe states in her declaration that "the Criminal Division followed the analysis described above [about a different FOIA request] and balanced the public interest in disclosure against the third-party individual's privacy interests," and "[b]ased on information available at the time of the request, the Criminal Division issued a categorical denial."  ECF No. 18-3, at 9 ¶ 21.  This explanation falls short of identifying Secretary Zinke's privacy interest in the existence of records related to the Interior OIG's referral.  Even if Secretary Zinke retained a substantial privacy interest in the existence of records relating to DOJ's decision not to prosecute (the second part of CREW's request), the court is doubtful that such a privacy interest existed for the first part.

Finally, CREW points to an additional FOIA request to support its claim that DOJ "essentially rubber stamps *Glomar* responses whenever it receives a request for investigative files relating to a named public official," even when no privacy interest exists.  ECF No. 23-1, at 20; *see id.* at 22.  CREW requested records from the Criminal Division related to DOJ and FBI investigations of "companies owned or associated with Donald J. Trump."  ECF No. 23-3, at 139. The Criminal Division issued a *Glomar* response, *id.* at 144, which CREW argues was improper because Exemptions 6 and 7(C)'s protection against unwarranted invasions of "personal privacy"

does not extend to corporations, ECF No. 23-1, at 22.  The court agrees.  President Trump has "no privacy interest in his mere *affiliation* with [his companies], even were the compan[ies] under scrutiny," and any companies owned or associated with President Trump have "no cognizable privacy interest under FOIA."  *Prop. of People*, 310 F. Supp. 3d at 71-72; *see Fed. Commc'ns Comm'n v. AT & T Inc.*, 562 U.S. 397, 408-10 (2011).  DOJ does not meaningfully dispute this, instead asserting that the Criminal Division later conducted a search after CREW appealed its determination and OIP remanded the request.  *See* ECF No. 29-3, at 16.  DOJ thus argues that the initial *Glomar* response "is not indicative of any improper DOJ-wide policy or practice because it was reasonably based on the conclusion that the entities that were the subject of the FOIA request never publicly acknowledged any DOJ investigation."  ECF No. 29, at 7.  But DOJ does not explain *why* those entities would have been protected by Exemptions 6 and 7(C) in the first place.  *See generally* ECF No. 29-3.  Instead, DOJ's explanation suggests that the Criminal Division treated President Trump, not his companies, as "the subject of the FOIA request," even though CREW did not seek records relating to an investigation into President Trump and, as noted, President Trump likely lacked a cognizable privacy interest in the existence of responsive records.  Because DOJ does not provide any declarations explaining its basis for issuing an initial *Glomar* response or for remanding the matter, the court cannot conclude that the Criminal Division made the threshold determination that Exemptions 6 and 7(C) applied.

Beyond the specific issues with the Criminal Division's response to the Zinke and Trump companies requests, it appears that, like the FBI, *see supra* pp. 42-44, the Criminal Division does not consider at the outset whether Exemptions 6 and 7(C) apply to the requested records.  Ms. O'Keefe avers that, upon receipt of a request, the Criminal Division first "assess[es] the subject of the request, including whether the request is a targeted third-party request."  ECF

No. 18-3, at 5 ¶ 10. "If the request seeks records pertaining to a third-party individual and the records sought could be of a particularly sensitive nature (*i.e.*, a law enforcement investigation)," the Criminal Division considers a *Glomar* response pursuant to Exemptions 6 and 7(C). *Id.* But according to Christina Butler, Chief of the Criminal Division's FOIA/PA Unit, the Criminal Division issued a *Glomar* response to CREW's request "by following the analysis described in [Ms. O'Keefe's declaration], which included noting no official acknowledgment by the Criminal Division of a law enforcement investigation of the subject of the request or an admission by the subject of the request, including companies owned or associated with the subject." ECF No. 29-3, at 3 ¶ 9. Notably absent from Ms. Butler's declaration is any justification for treating CREW's request as a "targeted third-party request." ECF No. 18-3, at 5 ¶ 10; *see generally* ECF No. 29-3. Accordingly, the Criminal Division's declaration does not show that it makes a threshold determination that Exemptions 6 and 7(C) apply when issuing *Glomar* responses.[28]

---

[28] CREW cites one additional FOIA request it submitted to OPR for investigation-related records that did not reference any public official by name and did not receive a *Glomar* response. ECF No. 23-1, at 20-22. CREW sought records from OPR relating to complaints of professional misconduct by members of the federal judiciary "as acknowledged by the 2023 OPR Annual Report." ECF No. 23-3, at 19. In response, the EOUSA—to which OPR had referred the request—released 108 responsive pages in full and three pages in part. *Id.* at 23. CREW asserts that the EOUSA's production "implicated [a federal judge] in misconduct by name," thereby reflecting the same privacy interests as its other requests about publicly disclosed investigations but resulting in disclosure rather than a *Glomar* response. ECF No. 23-1, at 21; *see* ECF No. 23-3, at 27-137 (production of court transcripts and filings related to a U.S. District Judge in the Southern District of Texas and three pages of redacted emails between federal prosecutors). According to CREW, DOJ's differential treatment of this request reflects its policy or practice of issuing "knee-jerk *Glomar* responses" whenever a request references an official by name. ECF No. 23-1, at 21-22. But, as CREW acknowledges, its request did not refer to any third party by name, so confirming the existence of responsive documents would not have confirmed that OPR investigated any specific individuals. *See PETA*, 745 F.3d at 545 (holding that a *Glomar* response was unwarranted for a request seeking documents showing that, in response to complaints filed against three named individuals, the agency conducted an investigation that did not target those

*(continued on next page)*

### d.    *Public-interest analysis*

Finally, CREW argues that, across the board, DOJ components require FOIA requesters to establish a "significant" or "overriding" public interest in disclosure to overcome Exemptions 6 and 7(C)." ECF No. 23-1, at 16-19.  According to CREW, this standard "is a work of fiction with respect to Exemptions 6 and 7(C)" and applies only to cases where the requester is attempting to overcome Exemption 2 or to recover attorney's fees.  *Id.* at 17.  CREW thus argues that DOJ begins its balancing of interests "with an artificially high standard for acceptable public interests," when it should be considering the specific public and privacy interests at stake for each request.  *Id.* at 19.

The court disagrees.  It is well established that when an agency invokes Exemption 6 or 7(C) and privacy interests protected by those exemptions exist, the requester must demonstrate a "significant" public interest.  *Favish*, 541 U.S. at 172; *see, e.g.*, *Roth*, 642 F.3d at 1175; *Lindsey*, 490 F. Supp. 3d at 18; *Marin v. Driscoll*, No. 24-CV-1508, 2025 WL 3152310, at *5 (D.D.C. Nov. 12, 2025).  This rule comes from the FOIA statute itself, which provides that records compiled for law enforcement purposes are presumptively exempt from disclosure if their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C); *see id.* § 552(b)(6) (requiring a "clearly unwarranted invasion of personal privacy" for personnel, medical, and similar files).  The Supreme Court has interpreted the term "unwarranted" to require courts to "balance the competing interests in privacy and

---

individuals).  Indeed, CREW does not appear to argue that a *Glomar* response would have been appropriate.  *See* ECF No. 23-1, at 21.  Because a *Glomar* response likely would not have been warranted—and because neither party addresses that question—the court cannot conclude that DOJ declined to issue a *Glomar* response to CREW's request simply because the request did not refer to an official by name.  This example therefore offers little insight into whether DOJ's other *Glomar* responses resulted from an unlawful policy or practice.

disclosure." *Favish*, 541 U.S. at 172. And, in doing such balancing, "[w]here the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure"—that is, "the citizen must show that the public interest sought to be advanced is a *significant* one, an interest more specific than having the information for its own sake." *Id.* (emphasis added). Contrary to CREW's assertions, this requirement is not limited to Exemption 2 or requests for attorney's fees. Indeed, in one of the cases CREW cites about Exemption 2, the court went on to apply the "significant" public-interest standard when considering Exemption 7(C). *Kishore v. U.S. Dep't of Just.*, 575 F. Supp. 2d 243, 257 (D.D.C. 2008) ("The public interest 'sought to be advanced [must be] a significant one more specific than having the information for [one's] own sake,' however." (alterations in original) (quoting *Favish*, 541 U.S. at 172)); *see* ECF No. 23-1, at 17.[29]

CREW appears to argue that no D.C. Circuit or Supreme Court precedent supports DOJ's approach, but *Favish*—a Supreme Court decision—clearly sets forth the relevant standard for weighing public and privacy interests under Exemptions 6 and 7(C). CREW claims that *Favish* is inapposite because the case "address[ed] standards for evaluating the use of [those exemptions] in response to requests based on the need to discover misconduct in the course of investigations." ECF No. 23-1, at 18 n.6. It is true that *Favish* imposed the additional requirement that a requester "establish more than a bare suspicion" of government impropriety when the public interest being

---

[29] Additionally, in many of the cases CREW cites as examples of this allegedly improper practice, *see* ECF No. 23-1, at 16-17, the court looked for a "significant" public interest asserted by the requester, *see, e.g.*, *CREW III*, 840 F. Supp. 2d at 234 ("The second step of the balancing test under Exemptions 6 and 7(C) is to determine whether there is a substantial public interest in releasing the requested documents."); *Garcia v. Exec. Off. for U.S. Att'ys*, 302 F. Supp. 3d 79, 91 (D.D.C. 2018) (applying *Favish*); *Black*, 69 F. Supp. 3d at 37 (same); *Graff v. Fed. Bureau of Investigation*, 822 F. Supp. 2d 23, 36 (D.D.C. 2011) (same).

asserted is to show government misconduct, 541 U.S. at 174, and that additional requirement does not apply when CREW is asserting a different public interest, *see, e.g.*, *CREW I*, 746 F.3d at 1094-96. But CREW misses the fact that the basic standard for evaluating Exemptions 6 and 7(C) set forth in *Favish* is equally applicable here. Regardless of whether a request seeks to uncover government misconduct or has some other purpose, the requester must identify a "significant" public interest wherever there is a privacy interest protected by Exemption 6 or 7(C). *See Favish*, 541 U.S. at 172; *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 71-72 (D.D.C. 2018) (considering whether the requester showed a significant public interest where the asserted public interest was, as here, "understanding how the agency conducted its investigation").

While the court disagrees with CREW's objections to the "significant public interest" standard, it notes that DOJ's declarations reveal potential errors in how two components—the Criminal Division and FBI—conduct the public-interest analysis. First, as CREW points out, the Criminal Division has a policy that "[w]ithout an official acknowledgment of an investigation, or a public announcement by the subject regarding the existence of any investigation, the requester *cannot demonstrate* that the requested information is likely to shed light on how the Criminal Division operates and thus, *will not articulate a substantial public interest*." ECF No. 18-3, at 8 ¶ 17 (emphases added); *see* ECF No. 23-1, at 15-16. This categorical rule is inconsistent with FOIA. The absence of an agency's official acknowledgment does not directly bear on the public interest in disclosure—rather, it simply means that the agency has not waived its right to invoke a *Glomar* response by disclosing the existence of responsive records. *See Knight First Amend. Inst.*, 11 F.4th at 815. Moreover, the absence of a public announcement by the subject bears on the subject's *privacy* interests, not the public interest in disclosure. When substantial privacy interests

58

exist, an agency has an "obligation to 'measure' the public interest in disclosure and 'weigh' it against the privacy interests at stake." *Cabezas v. Fed. Bureau of Prisons*, No. 20-CV-2484, 2023 WL 6312349, at *2 (D.D.C. Sep. 28, 2023) (quoting *Bartko*, 898 F.3d at 66). But the Criminal Division's categorical rule that a requester cannot show a substantial public interest without establishing an official acknowledgment or disclosure by the subject conflates the public and privacy interests at stake.

Second, when balancing privacy interests against the public interest, the Criminal Division and FBI appear to consider the public interest only in confirming the *existence* of responsive records. ECF No. 18-3, at 8-9 ¶ 20; ECF No. 18-4, at 6 ¶ 9. But when weighing the public interest, an agency must consider not only "the benefits of acknowledging the existence or non-existence of responsive records," but also "the potential *contents* of such records." *Heritage Found. v. U.S. Dep't of Just.*, No. 23-CV-1148, 2024 WL 1856418, at *7 (D.D.C. Apr. 29, 2024) (emphasis added) ("Even in *Glomar* cases where public interests other than revealing government misconduct are asserted, the D.C. Circuit and other courts in this district have considered how the possible contents of responsive records might weigh in favor of disclosure."). For example, in *PETA*, the D.C. Circuit observed that responsive records "would directly implicate the cognizable public interest in shedding light on [the agency's] investigatory processes." 745 F.3d at 545. When considering *privacy* interests, the agency must limit its consideration to the existence of responsive records, but that is not the case for considerations of the *public* interest. *See id.* at 541-43. This approach makes sense, because the "public may have an interest in confirming whether responsive records exist precisely because of the information such records might contain." *Heritage Found.*, 2024 WL 1856418, at *7. But Ms. O'Keefe avers in her declaration that the Criminal Division considers "the public interest in *confirming the existence or nonexistence* of records responsive to

[the] FOIA request," ECF No. 18-3, at 9 ¶ 20 (emphasis added); she does not state whether the Criminal Division also considers the public interest in the *contents* of those records.  The FBI's approach is similarly flawed.  Ms. Hammer states that, in conducting the public-interest analysis, the FBI "analyzes any alleged public interest in disclosure of the *existence* of records concerning the third party."  ECF No. 18-4, at 6 ¶ 9.  This narrow conception of the public interest does not comport with the agency's obligations under FOIA.[30]

### 3.    Whether DOJ maintains an unlawful policy or practice

As explained, CREW has provided substantial evidence that DOJ issued improper *Glomar* responses for: the Kelsey request with respect to records mentioning Mr. Smith (Criminal Division, failure to recognize an official acknowledgment), the Mastriano request (FBI, failure to consider his lawyer's acknowledgment), the Egyptian President request (FBI, failure to consider spokespersons' acknowledgments), the Giuliani/Kallstrom requests (FBI, failure to consider threshold exemption requirements and subjects' acknowledgments), the Kindred request (EOUSA, failure to consider privacy interest in the existence of each category of requested records), the Morehead request (EOUSA and OPR, failure to consider privacy interest in the existence of each category of requested records), the Zinke request (Criminal Division, failure to consider privacy interest in the existence of each category of requested records), and the Trump companies request (Criminal Division, failure to consider threshold exemption requirements).  CREW has also

---

[30] Because CREW is bringing a policy-or-practice claim and does not seek disclosure of the records at issue in these requests, the court does not address whether CREW established a sufficient public interest in the disclosure of its requested records for each of its requests.  The court simply concludes that DOJ components were required to consider both the public interest in disclosure of the *existence* of responsive records and the public interest in disclosure of the *contents* of those records.

identified—and the court has further discerned—problems with the Criminal Division's constricted approach to official acknowledgments and the FBI and Criminal Division's approach to the public-interest analysis. But to prevail on Count II, CREW must show that DOJ "adopted, endorsed, or implemented [a] policy or practice that constitutes an ongoing 'failure to abide by the terms of the FOIA.'" *Muttitt II*, 926 F. Supp. 2d at 293 (quoting *Payne Enters.*, 837 F.2d at 491). "[I]solated mistakes by agency officials" are not enough. *Payne Enters.*, 837 F.2d at 491.

In seeking summary judgment, CREW asserted that DOJ had a pattern or practice of issuing *Glomar* responses "simply because a FOIA request [sought] records relating to an investigation of a third party." ECF No. 1 ¶ 43. The summary judgment record shows that CREW cannot prevail on that claim. To begin, DOJ's declarations establish that each component engages in an individualized analysis and does not issue *Glomar* responses automatically whenever a request refers to an individual by name. *See* ECF No. 18-3, at 5 ¶ 10 ("The [Criminal Division's] FOIA/PA Unit reviews each request received and assesses the merits of every request . . . prior to issuing a determination on the request."); ECF No. 18-4, at 15 ¶ 27 ("[T]he FBI conducts a detailed case[-]by[-]case analysis to determine an appropriate response. The FBI . . . only withholds information, including by issuing *Glomars* . . . , if it determines there is a reasonably foreseeable harm to an interest protected by an exemption."); ECF No. 18-5, at 7 ¶ 14 ("[E]ach FOIA request to OIP seeking investigatory records about a named individual and each potential Glomar response is analyzed on a case-by-case basis and all reasonable efforts are made to ensure compliance with the FOIA, DOJ's regulations, and OIP's Guidance. OIP has consistently advised all federal agencies to consider whether there exists third-party consent, proof of death, or official acknowledgment of the existence of the investigation and to consider on [a] case-by-case basis whether the public interest outweighs the privacy interest."); ECF No. 18-6, at 5 ¶ 21 (explaining

61

that, in determining whether Exemption 7(C) applied to CREW's requests, the "EOUSA considered: (1) whether the requested records were compiled for law enforcement purposes, (2) whether there was a significant privacy interest in the requested information, (3) Plaintiff's asserted public interest in the requested information, and (4) whether the disclosure of information would reasonably be expected to constitute an unwarranted invasion of privacy"); ECF No. 29-2, at 5 ¶ 19 ("When a requester seeks OPR records about a specific individual, OPR conducts an individualized balancing of the interests to decide whether a *Glomar* response is appropriate."). While CREW has pointed to probative examples where DOJ may have fallen short of what FOIA requires, those examples fail to overcome the presumption of good faith afforded to DOJ's declarations.  *See SafeCard Servs.*, 926 F.2d at 1200; *see also Am. Oversight v. U.S. Env't Prot. Agency*, 386 F. Supp. 3d 1, 9-10 (D.D.C. 2019) (rejecting a policy-or-practice claim based in part on the agency's declaration that "all FOIA requests are reviewed individually").

Additionally, the fact that DOJ may have erred in issuing *Glomar* responses for some of CREW's requests does not lead to the conclusion that DOJ issued blanket *Glomar* responses simply because the requests sought records relating to investigations of third parties.  With respect to official acknowledgments, CREW presents at most one instance of a DOJ component ignoring an official acknowledgment of the existence of responsive records: the Criminal Division's *Glomar* response to the part of the Kelsey request regarding Mr. Smith.  It is unclear whether that official acknowledgment—a DOJ press release stating that the Criminal Division was prosecuting Mr. Smith, *see* DOJ Kelsey Press Release, *supra*—should be attributed to the Criminal Division or DOJ itself.  If the Criminal Division ignored an official acknowledgment by DOJ, then this error may constitute an example of the Criminal Division's overly narrow approach to official acknowledgments, which the court discusses below.  But to the extent the Criminal Division

ignored its own official acknowledgment, its error appears to be an isolated mistake and is insufficient to support the existence of a policy or practice of ignoring official acknowledgments. *See Am. Oversight*, 386 F. Supp. 3d at 14 (granting summary judgment to the agency on the plaintiff's policy-or-practice claim based on one instance of the agency denying a FOIA request solely for failure to provide a keyword or subject matter). And for the other components, DOJ offers declarations stating that its components consider Department-wide official acknowledgments in determining whether to issue a *Glomar* response. *See supra* pp. 22-23 (OPR and EOUSA declarations). According to OIP Chief of Staff Sean O'Neill, DOJ's Guide to the FOIA instructs components that:

> An agency may not be able to utilize a *Glomar* response where the subject of a request has already been publicly associated with agency law enforcement matters that would otherwise justify a *Glomar* response. For example, where there is a public acknowledgment of a law enforcement investigation by an agency official authorized to speak on behalf of the government, a *Glomar* response would be improper.

ECF No. 18-5, at 6 ¶ 12 (internal quotation marks omitted). CREW presents no evidence to the contrary suggesting that components (other than the Criminal Division) deviate from this official guidance.[31]

DOJ's other problematic *Glomar* responses also appear to be the product of request-specific judgment calls by DOJ components. For example, the issues the court has identified with the EOUSA and OPR's responses to the Morehead request, the EOUSA's response to the Kindred request, and the Criminal Division's response to the Zinke request are examples of

---

[31] CREW does not allege that the FBI and OIP ignored official acknowledgments, and DOJ's declarations about those components demonstrate that those components properly consider official acknowledgments when determining whether to issue *Glomar* responses. *See* ECF No. 18-4, at 3-5 ¶¶ 5-8 (FBI's approach); ECF No. 18-5, at 6-7 ¶ 13 (OIP's approach).

individual components failing to parse the privacy interests implicated by each part of a FOIA request, not a blanket policy of issuing *Glomar* responses whenever a request refers to an official by name. And while CREW presents four examples of the FBI's and the Criminal Division's failures to consider disclosures by the subject or their spokespersons and failures to consider the threshold requirements of Exemptions 6 and 7(C), *see supra* pp. 37-44, 53-55 (Mastriano, Egyptian President, Giuliani/Kallstrom, and Trump companies requests), it provides little evidence that those components' *Glomar* responses were the product of an unlawful policy or practice.

The court in *American Oversight* addressed a similarly deficient summary judgment record. 386 F. Supp. 3d at 8-14. There, the plaintiff asserted that the Environmental Protection Agency ("EPA") had a policy of refusing to process FOIA requests for communications records that did not provide specific keywords of subject matters. *Id.* at 8. As support, the plaintiff pointed to six FOIA requests for which the agency had refused to conduct a search because the responses failed to provide a keyword or a search term that could narrow the scope of the request, even though the requests "reasonably described" the requested records. *Id.* For one of those requests, the EPA argued that it could not process the request without specific domain names for the potential authors or recipients of records. *Id.* at 10. The court found that the plaintiff's dispute was "not with some unspoken policy of refusing to process the request until the requestor provides a keyword or subject matter for the email records sought, but with the EPA's specific determination that it could not search for the records without specifying non-[governmental] domain names for the potential authors or recipients." *Id.* Here, too, CREW's dispute is not with some unspoken policy of issuing "knee-jerk *Glomar* responses" whenever the request includes the name of a public official, ECF No. 23-1, at 21, but rather with errors in the agency's consideration of specific interests for specific requests.

64

The court agrees with CREW, however, that the above examples and DOJ's declarations reveal potentially erroneous practices in the Criminal Division's and the FBI's approaches to determining whether a *Glomar* response is appropriate.  First, the Criminal Division appears to limit its consideration of official acknowledgments to disclosures made by that component alone, even though other DOJ components may bind it.  *See supra* pp. 27-28.  Second, the FBI's declarations do not state whether it considers statements by a subject or their spokesperson in determining whether a subject's privacy interests have been diminished.  *See supra* Section IV.B.2.a (Mastriano, Egyptian President, and Giuliani/Kallstrom requests).  Third, it is not clear from the Criminal Division's and the FBI's declarations whether the components make the initial determination that responsive documents meet Exemptions 6 and 7(C)'s threshold requirements.  *See supra* pp. 42-44, 53-55 (Giuliani/Kallstrom and Trump companies requests).  Fourth and finally, the Criminal Division appears to follow an improper categorical rule that a requester can never establish a public interest in disclosure without an official acknowledgment or a public disclosure by the subject, and the Criminal Division's and the FBI's declarations suggest that both components apply an overly narrow conception of the public interest in disclosure.  *See supra* pp. 58-60.  These practices may support narrower policy-or-practice claims against the Criminal Division and/or the FBI because individual DOJ components, like the agency writ large, can engage in an unlawful policy or practice of asserting *Glomar* responses.  *See* ECF No. 12, at 13-14.

Of course, it may very well be that CREW, having learned that DOJ does not have a broad policy of "issuing *Glomar* responses to CREW simply because a FOIA request seeks records relating to an investigation of a third party," ECF No. 1 ¶ 43, does not wish to proceed on narrower policy-or-practice claims.  And if CREW wishes to proceed, supplemental declarations from DOJ

could reveal that some of these apparent policies or practices—such as the FBI's failure to consider disclosures by subjects' spokespersons—are "merely isolated mistakes." *Payne Enters.*, 837 F.2d at 491. Supplemental declarations might also demonstrate that the Criminal Division's and the FBI's consideration of official acknowledgments, the threshold requirements of Exemptions 6 and 7(C), and the public interest all comport with FOIA.[32] Rather than make any of those determinations without the benefit of the parties' insights, the court denies both parties' motions for summary judgment on Count II and directs the parties to meet and confer regarding CREW's individual policy-or-practice claims.[33]

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that CREW's Motion for Summary Judgment on Count I, ECF No. 22, is **DENIED** as moot, and DOJ's Motion for Summary Judgment on Count II, ECF No. 18, and CREW's Cross-Motion for Summary Judgment on

---

[32] For example, DOJ does not expressly contest CREW's interpretation of the O'Keefe declaration that the Criminal Division only considers its own official acknowledgments. *See* ECF No. 29, at 3. But at the same time, DOJ argues that the Criminal Division, like every other component, "consider[s] . . . any official disclosure by DOJ." *Id.*; *see* ECF No. 18-3, at 8-9 ¶ 20 (stating that the "Criminal Division was not aware of any evidence indicating that the *Department* publicly acknowledged the existence of an investigation involving the individuals referenced in parts" of the Kelsey request (emphasis added)). It is therefore possible that the Criminal Division does consider official acknowledgments by other DOJ components and its declaration did not state that explicitly because CREW had not raised that specific argument.

[33] CREW also seeks discovery pursuant to Rule 56(d) to uncover "evidence of the existence of a policy and the extent of DOJ components' noncompliance with FOIA by issuing even more *Glomar* responses to requests for investigative files that identify subjects by name." ECF No. 23-1, at 37. The court concludes that discovery would be premature before the parties confer regarding the scope of CREW's policy-or-practice claims.

Count II, ECF No. 23, are **DENIED**.  It is further **ORDERED** that the parties shall meet, confer,

and file a joint status report on or before April 13, 2026, proposing next steps in this litigation.

   **SO ORDERED.**


_____

LOREN L. ALIKHAN
United States District Judge

Date:   March 30, 2026